REVISED APRIL 22, 2010
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 22, 2010

Lyle W. Cayce
Clerk

No. 09-60095

BOLLINGER SHIPYARDS INC; AMERICAN LONGSHORE MUTUAL
ASSOCIATION,

Petitioners

v.

DIRECTOR, OFFICE OF WORKER'S COMPENSATION PROGRAMS, US
DEPARTMENT OF LABOR; JORGE RODRIGUEZ,

Respondents

---

Petition for Review of a Final Order
of the Benefits Review Board

---

Before GARWOOD, WIENER, and BENAVIDES, Circuit Judges.

WIENER, Circuit Judge:

Bollinger Shipyards, Inc. ("Bollinger"), petitions for review of an order of the Benefits Review Board ("BRB") awarding benefits under the Longshore and Harbor Workers' Compensation Act ("the LHWCA") to Jorge Rodriguez ("Rodriguez"), an undocumented immigrant who fell and injured himself while employed by Bollinger as a pipefitter. We deny the petition.

## I. FACTS AND PROCEEDINGS

A.     Facts

In October 2003, Rodriguez fell and injured himself while performing a welding job for Bollinger, his employer.  At the time of his injury, Rodriguez had been working as a pipefitter for Bollinger for approximately eight months, having initially obtained employment with Bollinger after stating falsely that he was a U.S. citizen and providing the company with a false Social Security number.  Bollinger does not dispute that Rodriguez's injury occurred in the course and scope of his employment or that, were it not for his status as an undocumented immigrant, he would be entitled to benefits under the LHWCA. Rather, Bollinger contends that, by virtue of Rodriguez's undocumented status and his use of a false Social Security number to obtain employment, he should be precluded from recovering any LHWCA-related benefits.

Bollinger initially paid Rodriguez temporary disability benefits and reimbursed him for a portion of his medical expenses.  After almost two years, however, Bollinger terminated all payments in November 2005 when it discovered that Rodriguez was an undocumented immigrant.  Rodriguez then filed for benefits from Bollinger under the LHWCA, and the case proceeded to an administrative trial.

B.     Proceedings

1.     The administrative trial

Proceeding pro se before the ALJ, Rodriguez testified that he had first come to the United States illegally in 1990 and had used a false Social Security number to obtain a series of jobs, working first as a bartender and then as a forklift operator in Texas before moving to Louisiana in 1998.  In Louisiana,

2

Rodriguez worked for several different employers in the marine industry before beginning to work as a pipefitter for Bollinger in March 2003.

According to Rodriguez, he was welding an inclined wall of a ship on the night of his accident when he fell and landed on his back. Rodriguez testified that he lay on the ground for approximately 10 to 15 minutes before he was able to stand up and report the incident to a supervisor. According to Rodriguez, his immediate supervisor instructed him to go home that night and report back the following day for medical treatment, explaining that it would cost Bollinger significantly more to have him treated that evening.

Rodriguez further testified that the following day Tim Hargrove, Bollinger's "safety man," filled out an accident report and directed Rodriguez to seek medical treatment from Dr. Tate. That physician recommended that Rodriguez be reassigned to light-duty work in the tool room. Rodriguez worked light duty for less than a month, however, eventually stopping because his back had worsened progressively to the point that he could no longer work in any capacity. Rodriguez provided the ALJ with reports from several physicians, including Dr. Hamsa, who had diagnosed Rodriguez as being temporarily disabled and unable to perform any work unless he had back surgery, underwent additional open MRI testing, and received various orthopedic supplies, such as a cane and back support.

Bollinger called two witnesses: Ray Barker, Bollinger's corporate representative; and Larry Stokes, Bollinger's vocational rehabilitation expert. Barker testified about Bollinger's company practices to safeguard against hiring undocumented workers. According to Barker, the company required prospective

employees to submit a valid driver's license and a Social Security number.[1] Barker stated that Bollinger's primary method of verifying an employee's eligibility to work in this country was to send the employee's Social Security number to the IRS at the end of the year and then wait to see if the IRS returned a report indicating that the number was invalid. As Rodriguez had only worked for Bollinger from March to November, however, Bollinger had not submitted his Social Security number to the IRS prior to his injury. Barker was unable to confirm whether Bollinger had attempted to verify Rodriguez's legal status by any other means, as the company's personnel records had been destroyed during Hurricane Katrina.

Stokes testified regarding his vocational report on Rodriguez's earning capacity and job skills. Stokes noted that his efforts in compiling the report were complicated by Rodriguez's refusal to participate in any vocational rehabilitation counseling. He acknowledged, however, that it was not entirely uncommon for plaintiffs in Rodriguez's position to decline such counseling. Stokes began his analysis by observing that, as a threshold matter, Rodriguez was not employable in the U.S. in any legal capacity because of his status as an undocumented immigrant; and that, as a result, it would have been improper and unethical for him to assist Rodriguez in vocational rehabilitation. Nevertheless, for purposes of comparison, Stokes performed a vocational evaluation of Rodriguez's earning capacity without regard to his legal status, concluding that Rodriguez was capable of performing a variety of light-to-medium-duty jobs that would earn him between $250 and $600 in average weekly salary. Stokes reiterated,

---

[1] At the time of Rodriguez's employment with Bollinger, he apparently had a Texas driver's license.

however, that even if Rodriguez's injury prevented his performing light-duty work, he had suffered no loss of legal earning capacity, as he had had no legal earning capacity prior to being injured.

### 2. The ALJ's ruling

The ALJ ruled in favor of Rodriguez on all issues, concluding that he was unable to work and that he was "not at maximum medical improvement because of a need for back surgery." After conducting a thorough review of the evidence and the testimony of each witness, the ALJ explained that he found Rodriguez to be a credible witness and that, although he was impressed by each physician and witness who had testified or submitted reports, he found Dr. Hamsa's assessment of Rodriguez's condition to be the most accurate diagnosis. The ALJ agreed with Dr. Hamsa's recommendation that Rodriguez should receive reasonable and necessary procedures and devices, including back surgery, additional MRI testing, and orthopedic supplies.

With respect to Rodriguez's eligibility for benefits under the LHWCA, the ALJ held that undocumented immigrants such as Rodriguez are indeed eligible for such benefits. Citing our opinion in Hernandez v. M/V Rajaan,[2] the ALJ concluded that Rodriguez was entitled to benefits under the LHWCA, largely because Bollinger had failed to present any evidence that Rodriguez was "about to be deported or would surely be deported." The ALJ also found persuasive the D.C. Circuit's opinion in Rivera v. United Masonry, Inc.,[3] in which that court declined to take into consideration an immigrant's undocumented status when determining his eligibility for benefits. The ALJ explained that he had not

---

[2] 841 F.2d 582, amended after rehearing, 848 F.2d 498 (5th Cir. 1988).

[3] 948 F.2d 774, 775 (D.C. Cir. 1991).

considered Rodriguez's legal status in any way "as a factor in computing compensation, but rather [had] considered other factors such as pain levels, past work, and working capacity as considered by the [BRB] and the Fifth Circuit."

In sum, the ALJ ordered that (1) Bollinger pay Rodriguez temporary total disability benefits from the date of the accident to the present, with benefits to continue until Rodriguez reached maximum medical improvement; (2) the payment should be calculated using the base rate of $568.00 per week, with two-thirds benefits per statute, totaling $378.67; (3) Bollinger should compensate Rodriguez for all reasonable past and future medical treatment, including back surgery, open MRI testing, and appropriate orthopedic devices as recommended by Dr. Hamsa; and (4) interest should be assessed on all unpaid benefits. After the ALJ issued his decision, the district director awarded attorney's fees to Rodriguez's prior counsel.

3.    Bollinger's appeal to the BRB

Bollinger appealed the ALJ's ruling to the BRB, contending that the ALJ had fundamentally erred in concluding that Rodriguez, an undocumented immigrant, was entitled to benefits under the LHWCA. In the alternative, Bollinger urged the BRB to conclude that the ALJ's factual findings were in error and were not supported by substantial evidence in the record. According to Bollinger, the ALJ had, inter alia, failed to give adequate consideration to Stokes's vocational report identifying suitable alternate employment for Rodriguez.

After conducting a complete review of the trial record and the evidence submitted to the ALJ, the BRB affirmed the ALJ's order in all respects. As a threshold matter, the BRB held that undocumented immigrants such as Rodriguez are indeed entitled to benefits under the LHWCA. Citing our decision

in Hernandez, the BRB agreed with the ALJ that Rodriguez was entitled to compensation given Bollinger's failure to show that Rodriguez's deportation was "imminent." Further, the BRB approved the ALJ's reliance on the D.C. Circuit's decision in Rivera for the proposition that "the issue of illegal alienage does not affect compensation entitlement under the [LHWCA]." Finally, the BRB reviewed the plain language of the LHWCA and concluded that the text of the statute reflected Congress's intent to provide coverage for undocumented immigrants. As the BRB explained,

> [t]he [LHWCA's] definition of "employee" does not differentiate between individuals based on their citizenship status. Rather, [33 U.S.C. § 902(3)] in pertinent part, states that "the term 'employee' means any person engaged in maritime employment..." (emphasis added). Additionally, while the definition includes specific exceptions to the term "employee," none of those exceptions precludes coverage based on an individual's citizenship or immigration status. Furthermore, [33 U.S.C. § 909(g)] and its implementing regulation ... state that compensation paid to aliens not residents, or about to become nonresidents, of the United States or Canada, "shall be in the same amount as provided for residents," with certain exceptions relating to a claimant's dependents in a foreign country and a provision allowing the Secretary to commute future payments. Thus, the Act does not differentiate between the disability compensation paid to illegal aliens and that paid to legal residents and/or citizens of the United States. Consequently, we reject [Bollinger's] contention that [Rodriguez's] status as an illegal alien precludes [his] entitlement to benefits.

With respect to the ALJ's factual findings, the BRB reviewed the evidence in detail before concluding that the findings were supported by substantial evidence in the record. According to the BRB, the ALJ had "rationally accorded greatest weight to [Rodriguez's] description of the back pain he experienced ... along with the opinion of his treating physician, Dr. Hamsa, who has

consistently stated that the October 22, 2003, back injury prevents [Rodriguez] from performing any work." The BRB also affirmed the ALJ's award of interest on all unpaid benefits, as well as the district director's award of attorney's fees to Rodriguez's prior counsel, explaining that Bollinger's "arguments on both issues [were] premised on its position that the administrative law judge improperly awarded benefits in this case, which we have rejected."[4]

Bollinger now petitions for review of the BRB's decision. Both Rodriguez and the Director for the Office of Workers' Compensation Programs of the United States Department of Labor ("the Director") have filed responses. In addition, several amici curiae, including the Pro Bono Project of New Orleans, the New Orleans Workers' Center for Racial Justice, the Southern Poverty Law Center, and the National Employment Law Project, have joined in the filing of a brief in support of Rodriguez's eligibility for benefits under the LHWCA.

## II. STANDARD OF REVIEW

In reviewing a decision of the BRB, our "only function is to correct errors of law and to determine if the BRB has adhered to its proper scope of review, i.e., has the BRB deferred to the ALJ's fact-finding or has it undertaken de novo review and substituted its views for the ALJ's."[5] Stated differently, once the BRB affirms an order of the ALJ, we need only inquire whether the BRB "correctly concluded that the [ALJ's] order was supported by substantial evidence on the record as a whole and is in accordance with the law."[6] Although

---

[4] The BRB also noted, however, that the district director's award of attorney's fees to Rodriguez's prior counsel was not properly before the BRB on review, as Bollinger had not appealed that issue.

[5] Avondale Shipyards, Inc. v. Vinson, 623 F.2d 1117, 1119 n. 1 (5th Cir. 1980).

[6] Ingalls Shipbuilding, Inc. v. Director, OWCP, 991 F.2d 163, 165 (5th Cir. 1993).

we review all questions of law de novo, the Director's interpretation of the LHWCA is entitled to some degree of deference.[7] As for findings of fact, we have repeatedly acknowledged that the ALJ, as sole factfinder, "is entitled to consider all credibility inferences [and his] selection among inferences is conclusive if supported by the evidence and the law."[8]

## III. LAW AND ANALYSIS

Bollinger contends that undocumented immigrants such as Rodriguez are per se ineligible to receive indemnity benefits under the LHWCA, as any such benefits "would be based on illegally obtained wages."[9] Bollinger reasons that Rodriguez's injury caused him no loss of wage-earning capacity because he had no legal wage-earning capacity at the time he was injured. Bollinger histrionically compares the BRB's ruling to "awarding benefits to a drug dealer based on ill-gotten 'wages,' [and] then telling the employer that it better find another illegal enterprise for the drug dealer, lest there be found a permanent loss of wage[-]earning capacity." In the same melodramatic style, Bollinger compares awarding benefits to Rodriguez to "awarding benefits to a pirate or a Mafioso."

---

[7] New Orleans Stevedores v. Ibos, 317 F.3d 480, 483 (5th Cir. 2003). As we have previously explained, the appropriate amount of deference to be given to the Director's analysis "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade …" See id. (internal quotation marks and citation omitted); see also H.B. Zachry Co. v. Quinones, 206 F.3d 474, 478 (5th Cir. 2000) ("Indeed, deference is owed to the Director's views and not the views of the [Board].").

[8] Mendoza v. Marine Pers. Co., 46 F.3d 498, 500-01 (5th Cir. 1995) (internal quotation marks and citation omitted).

[9] In its reply brief, Bollinger narrowed its argument somewhat, contending that only those undocumented immigrants who falsify employment documents should be precluded from receiving such benefits.

Both Rodriguez and the Director respond straightforwardly that undocumented immigrants such as Rodriguez are entitled to benefits under the LHWCA, relying on the statutory text of the LHWCA and Fifth Circuit precedent as direct support for such an award. Further, the Director describes Bollinger's attempts to compare Rodriguez to a "cocaine dealer," a "car thief," a "pirate," and a "Mafioso" as "offensive, misleading and a gross manipulation of the reality of the situation." Moreover, the several amici curiae reason that, inter alia, "failing to require workers' compensation for immigrant workers encourages employers to hire undocumented workers."

A.    The statutory language of the LHWCA

"In answering any statutory question, we begin with the language of the statute itself."[10]    By its express terms, the LHWCA provides workers' compensation benefits to "employees" who are injured "upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing dismantling, or building a vessel)."[11]    The LHWCA defines an "employee" as "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations...."[12]    The statute contains several limited exceptions to

---

[10]  Cooper/T. Smith Stevedoring Co., Inc. v. Liuzza, 293 F.3d 741, 745 (5th Cir. 2002); see Smith v. City of Jackson, 351 F.3d 183, 188 (5th Cir. 2003) ("The construction of a statute begins with the text of the statute itself.").

[11]  33 U.S.C. § 903(a).

[12]  33 U.S.C. § 902(3) (emphasis added).

this definition, but each exception is based on an individual's job description and makes no reference to the individual's immigration status.[13]

In reviewing similar federal labor and employment laws, both the Supreme Court and this court have concluded that the subject laws provide coverage to undocumented immigrants. In Sure-Tan, Inc. v. NLRB, the Supreme Court reviewed the statutory language of the National Labor Relations Act ("NLRA") and concluded that, because "undocumented aliens are not among the few groups of workers expressly exempted by Congress [in that statute], they plainly come within the broad statutory definition of 'employee.'"[14] Similarly, in In re Reyes, we reviewed the statutory language of the Fair Labor Standards Act ("FLSA") and concluded that the statute's use of the broad term "employees" reflected the intent of Congress that it apply to "citizens and aliens alike, and whether the alien is documented or undocumented is irrelevant."[15]

We also find persuasive the section of the LHWCA entitled "Aliens," which states that "[c]ompensation under [the LHWCA] to aliens not residents (or about to become nonresidents) of the United States or Canada shall be the same in amount as provided for residents."[16] Although the statute does not expressly define the term "alien" and makes no reference to "illegal" or "undocumented" immigrants, its coverage of nonresident "aliens" is significant. Other courts that

---

[13] For example, the LHWCA's definition of an "employee" does not encompass, e.g., "individuals employed exclusively to perform office clerical, secretarial, security, or data processing work," 33 U.S.C. § 902(3)(A), or "individuals employed by a club, camp, recreational operation, restaurant, museum, or retail outlet," 33 U.S.C. § 902(3)(B).

[14] 467 U.S. 883, 981-82 (1984).

[15] 814 F.2d 168, 170 (5th Cir. 1987).

[16] 33 U.S.C. § 909(g) (emphasis added).

have interpreted similar workers' compensation statutes have concluded that the unmodified term "alien" encompasses both documented and undocumented immigrants. For example, the Minnesota Supreme Court, in interpreting that state's workers' compensation statute, explained:

> The clear language of the Act does not distinguish between authorized and unauthorized aliens. Following our rules of statutory construction, when the words of a law are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of [pursuing] its spirit. Had the legislature intended to exclude unauthorized aliens from coverage under the [statute], it could easily have done so, as it did with certain types of farm workers who are explicitly excluded from the definition of "employee," but it did not. Applying the Act as it is written, "aliens," whether authorized or unauthorized, are employees and thus are subject to the Act's provisions.[17]

As the plain statutory language of the LHWCA broadly defines the term "employee" and specifies that nonresident "aliens" are entitled to benefits in the

---

[17] Correa v. Waymouth Farms, Inc., 664 N.W.2d 324, 329 (Minn. 2003). Several other courts have considered this same issue and have reached similar conclusions. For example, in Economy Packing Co. v. Illinois Worker's Compensation Commission, a state appellate court explained:

> In interpreting a statute, undefined words are given their plain and ordinary meaning. When unmodified, the term "alien" is broad enough in scope to encompass any "person who resides within the borders of a country but is not a citizen or subject of that country." The plain meaning of aliens, therefore, includes not only foreign-born citizens that can legally work in the United States, but also those that cannot. Had the legislature intended otherwise, it could have defined the term or modified it with more specific language. Consequently, we conclude that all aliens in the service of another pursuant to a contract for hire, regardless of their immigration status, are considered "employees" within the meaning of the Act and, under Illinois law, are entitled to receive workers' compensation benefits.

901 N.E.2d 915, 920 (Ill. App. 1 Dist. 2008).

same amount as other claimants, we are convinced beyond cavil that Rodriguez was an employee within the intendment of the statute and is thus eligible for workers' compensation benefits.

B.    Fifth Circuit precedent

Our interpretation of the statutory text of the LHWCA is consistent with our holding in Hernandez v. M/V Rajaan.[18]  The plaintiff in Hernandez was an undocumented immigrant employed as a longshore worker and was injured during the course of his employment.[19]  The plaintiff sued the vessel and its owner under Section 5(b) of the LHWCA [33 U.S.C. § 905(b)], which states that "a person covered under [the LHWCA] ... may bring an action against [the] vessel as a third party...."[20]  The district court awarded the plaintiff damages, including future medical expenses and lost wages based on his prior earnings during his employment while in the United States.[21]

On appeal, the vessel owner contended that the employee "should be deemed ineligible to recover lost future United States wages and United States medical expenses because he was not entitled to be present and employed in the United States for the remainder of his life."[22]  Rejecting the vessel owner's argument, we affirmed the district court's award of damages to the plaintiff, including future medical expenses, loss of future earning capacity, and lost

---

[18]  841 F.2d 582, amended after rehearing, 848 F.2d 498 (5th Cir. 1988).

[19]  841 F.2d at 585.

[20]  Id.  As the plaintiff in Hernandez had sued in tort, the case did not proceed to an ALJ but was instead decided by a district court.

[21]  Id.

[22]  Id. at 588.

future wages.[23]  As we explained, the primary issue on appeal was whether, given the plaintiff's status as an undocumented immigrant, "the district court's decision to grant damages ... for future lost wages based upon [the plaintiff's] employment status at the time of injury and for the lengthy period preceding injury was clearly erroneous."[24]  After reviewing the record evidence and the statutory text of the LHWCA, we concluded that the district court had not so erred.[25]  Thus, although we did not directly address the issue in our opinion, Hernandez stands for the proposition that undocumented immigrants are eligible to recover workers' compensation benefits under the LHWCA.[26]

C.      The Immigration Reform and Control Act of 1986

Undeterred, Bollinger insists that we must not end our analysis with either the statutory text of the LHWCA or our precedential decisions on this issue, but that we must now interpret the LHWCA in light of the Immigration Reform and Control Act of 1986 ("the IRCA"), a "comprehensive scheme

---

[23]  Id.  We did, however, reduce some of the individual damages as excessive.  For example, we ruled that the district court's award of more than $800,000 in lost future wages was excessive, and, after reviewing the record evidence and the testimony, we reduced that amount to $190,296.

[24]  Id.

[25]  Id.

[26]  Bollinger contends that Hernandez is distinguishable from the instant case because the primary issue in Hernandez was whether the claimant's "continuous residency" in the United States qualified him to receive LHWCA benefits.  Bollinger's argument, however, is based on a portion of Hernandez that was later withdrawn on rehearing.  See Hernandez v. M/V Rajaan, 848 F.2d 498 (5th Cir. 1988).  In our initial opinion, we had suggested that the claimant "likely" qualified for permanent residency under the IRCA, thus ameliorating any tension with the immigration policies expressed in that statute.  On rehearing, however, we noted that it was "improper" to speculate as to whether the claimant qualified for such relief, as the issue had not been briefed and was, in any event, immaterial to our holding.

prohibiting the employment of illegal aliens in the United States."[27]  According to Bollinger, regardless whether the statutory text of the LHWCA or our precedent supports an award of benefits to Rodriguez, such an award would undermine the immigration policies expressed by Congress in the IRCA. Although we agree with Bollinger's basic premise that a thorough review of the IRCA is prudent, we disagree that the BRB's ruling in any way undermines the congressional policies embedded in the IRCA.

In enacting the IRCA, Congress "forcefully made combating the employment of illegal aliens central to the policy of immigration law."[28] Congress thus focused foremost on the employer.[29]  Under the IRCA, employers must verify the identity and eligibility of all new hires by examining specified documents before each employee begins work.[30]  If a prospective new hire is unable to produce the required documentation, the employer may not hire the individual.[31]  Employers that violate the IRCA are punished by civil fines and may be subject to criminal prosecution.[32]

The IRCA does make it a crime for an undocumented immigrant to subvert this employer-verification system by tendering false or fraudulent documents for

---

[27] See Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 147 (2002).

[28] Id. (internal quotation marks and citation omitted).

[29] See 8 U.S.C. § 1324a ("Unlawful employment of aliens").

[30] 8 U.S.C. § 1324a(b).

[31] 8 U.S.C. § 1324a(a)(1).

[32] 8 U.S.C. § 1324a(f)(1).

purposes of obtaining employment in the United States.[33] Specifically, the IRCA subjects any individual who uses or attempts to use such documents to fines and criminal prosecution, providing nothing regarding civil effects.[34] More to the point, the parties do not dispute that Rodriguez violated the IRCA when he proffered a false Social Security number to obtain employment with Bollinger. Rather, the question is whether that violation precludes his eligibility to receive workers' compensation benefits under the LHWCA. To answer this question, we must consider it in the framework of the Supreme Court's decision in Hoffman Plastic Compounds v. NLRB, the most recent in a line of cases reviewing backpay-reinstatement orders by the National Labor Relations Board ("NLRB") that are in tension with other federal laws.[35]

The line of cases of which Hoffman is the most recent can be traced back to Southern S.S. Co. v. NLRB, in which the World War II-era Court reviewed an NLRB order reinstating several seamen who had engaged in a labor strike while their vessel was midway through its voyage.[36] In Southern S.S., the Court concluded that the seamen had committed mutiny in direct violation of the criminal code.[37] As the Court explained,

> [t]he difficulty with the [NLRB's reinstatement order] is that it ignores the plain Congressional mandate that a rebellion by seamen against their officers on board a vessel anywhere within the

---

[33] 8 U.S.C. § 1324c(a)(1)-(3).

[34] 18 U.S.C. § 1546(b).

[35] 535 U.S. 138 (2002).

[36] 316 U.S. 31, 48-49 (1942).

[37] Id. at 43.

admiralty and maritime jurisdiction of the United States is to be punished as a mutiny. If this mandate is to be changed, it must be changed by Congress and not by the Courts....

The Board has not been commissioned to effectuate the policies of the Labor Relations Act so single-mindedly that it may wholly ignore other and equally important Congressional objectives. Frequently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another, and it is not too much to demand of an administrative body that it undertake this accommodation without excessive emphasis on its immediate task.[38]

In the next decision in the Hoffman line of cases, Sure-Tan, Inc. v. NLRB, the Court reviewed an NLRB order providing undocumented workers with backpay for their employer's labor-law violation.[39] In Sure-Tan, several undocumented workers had elected to form a union, and their employer retaliated by reporting them to authorities as undocumented immigrants and having them deported.[40] The issue before the Court was whether, assuming the employer had committed a labor violation, the undocumented employees were eligible for backpay for the period during which they had been deported.[41]

The Court began its analysis by confirming that undocumented immigrants are "employees" within the intendment of the NLRA and are thus

---

[38] Id. at 43-47.

[39] 467 U.S. 883 (1984).

[40] Id. at 886-89.

[41] Id.

entitled to its protections.[42] As the Court also explained, however, "[i]n devising remedies for unfair labor practices, the [NLRB] is obliged to take into account another equally important Congressional objective — to wit, the objective of deterring unauthorized immigration that is embodied in the [Immigration and Nationality Act ("INA")]."[43] Concluding that the backpay award would have undermined the immigration policies expressed by Congress in the INA, the Court vacated the NLRB's order.[44] Although acknowledging "[t]he probable unavailability of the [NLRA's] more effective remedies in light of the practical workings of the immigration laws," the Court explained that "[a]ny perceived deficiencies in the NLRA's existing remedial arsenal can only be addressed by congressional action."[45]

The most recent decision in this line of cases is Hoffman Plastic Compounds, Inc. v. NLRB, in which the Court held that federal immigration policy, as expressed by Congress in the IRCA, precluded the NLRB from awarding backpay to an undocumented immigrant who had never been legally authorized to work in the United States.[46] As in Sure-Tan, the employer in Hoffman had fired an employee for attempting to organize a union — a clear

---

[42] Id. at 891-92 ("Since undocumented aliens are not among the few groups of workers expressly exempted by Congress, they plainly come within the broad statutory definition of 'employee.'").

[43] Id. at 903.

[44] Id.

[45] Id. at 904.

[46] 535 U.S. 138 (2002).

violation of the NLRA.[47]  Among other remedies, the NLRB ordered that the employer offer the employee reinstatement with backpay.[48]  At a subsequent hearing before the ALJ, however, the employee testified that he was an undocumented immigrant and that he had used fraudulent documents to obtain employment.[49]  Concluding that "the most effective way to accommodate and further the immigration policies embodied in [the IRCA] is to provide the protections and remedies of the [NLRA] to undocumented workers in the same manner as to other employees," the NLRB ordered the employer to provide the employee with backpay from the date of his termination to the date the employer first learned of the employee's undocumented status.[50]

Framing the issue before it as whether the NLRB had exceeded its discretion by awarding backpay "to an illegal alien for years of work not performed, for wages that could not lawfully have been earned, and for a job obtained in the first instance by a criminal fraud," the Court in Hoffman vacated the NLRB's order.[51]  The Court began its analysis by summarizing its prior decisions in Southern S.S. and Sure-Tan, explaining that those cases stand for the proposition that, "where the [NLRB's] chosen remedy trenches upon a federal statute or policy outside the Board's competence to administer, the

---

[47]  Id. at 140.

[48]  Id. at 140-41.

[49]  Id. at 141.

[50]  Id. at 141-42.

[51]  Id. at 152.

Board's remedy may be required to yield."[52] The Court then highlighted an important development in federal law that had occurred post-Sure-Tan: Congress's passage of the IRCA.[53] As the Court noted, "[u]nder the IRCA regime, it is impossible for an undocumented alien to obtain employment in the United States without some party directly contravening explicit congressional policies."[54] According to the Court, the NLRB's order ran "counter to policies underlying the IRCA, policies the Board has no authority to enforce or administer."[55] The Court explained:

> What matters here ... is that Congress has expressly made it criminally punishable for an alien to obtain employment with false documents. There is no reason to think that Congress nonetheless intended to permit backpay where but for an employer's unfair labor practices, an alien-employee would have remained in the United States illegally, and continued to work illegally, all the while successfully evading apprehension by immigration authorities....
>
> The Board admits that had the INS detained [the employee], or had [the employee] obeyed the law and departed to Mexico, [he] would have lost his right to backpay. [The employee] thus qualifies for the Board's award only by remaining inside the United States illegally. Similarly, [the employee] cannot mitigate damages, a duty our cases require, without triggering new IRCA violations, either by tendering false documents to employers or by finding employers willing to ignore IRCA and hire illegal workers. The Board here has failed to even consider this tension.

---

[52] Id. at 147.

[53] Id. at 147-48.

[54] Id. at 148.

[55] Id. at 149.

> We therefore conclude that allowing the Board to award backpay to illegal aliens would unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA. It would encourage the successful evasion of apprehension by immigration authorities, condone prior violations of the immigration laws, and encourage future violations. However broad the Board's discretion to fashion remedies when dealing only with the NLRA, it is not so unbounded as to authorize this sort of an award.[56]

Agreeing with the Director's interpretation of the LHWCA in the instant case, we conclude that the Hoffman line of cases is distinguishable for at least three significant reasons: (1) Unlike discretionary backpay under the NLRA, workers' compensation under the LHWCA is a non-discretionary, statutory remedy; (2) unlike the NLRA, the LHWCA is a substitute for tort law, abrogating fault of either the employer or the employee; and (3) awarding death or disability benefits post hoc to an undocumented immigrant under the LHWCA does not "unduly trench upon" the IRCA, as Congress chose to include a provision in the LHWCA expressly authorizing the award of benefits "in the same amount" to nonresident aliens.

1. Workers' compensation under the LHWCA is a non-discretionary remedy

As the Court's decision in Hoffman makes clear, backpay under the NLRA is merely one of several discretionary remedies available to the NLRB in addressing labor violations.[57] In addition to backpay, the NLRB has authority to order several other "traditional remedies sufficient to effectuate national labor

---

[56] Id. at 149-52 (internal quotation marks and citations omitted).

[57] Id. at 144.

21

policy regardless of whether the spur and catalyst of backpay accompanies them."[58]  For example, the Court in Hoffman concluded that the NLRB's other available remedies, e.g., requiring the employer to post appropriate notices in the workplace, would have effectively promoted the goals of the NLRA without unduly trenching on the policy goals set forth in the IRCA.[59]

In contrast, awarding workers' compensation benefits under the LHWCA is a non-discretionary remedy.  Indeed, the plain statutory text of the LHWCA mandatorily states that "compensation shall be payable under this chapter in respect of disability or death of an employee."[60]  The LHWCA, unlike the NLRA, does not contain any optional or alternative remedies that could otherwise fulfill the statute's purpose.

2.     The LHWCA was enacted as a substitute for tort claims

Unlike the NLRA, but like most workers' compensation statutes, the LHWCA's remedial scheme is a substitute for the tort claims that an injured employee could otherwise bring against his employer.  Indeed, the LHWCA specifies that an employer's liability under the statute is "exclusive and in place of all other liability of such employer to the employee ..."[61]  Only if the employer "fails to secure payment of compensation" may an eligible employee "maintain an action at law or in admiralty for damages."[62]  Therefore, under the quid pro

---

[58]  Id.

[59]  Id.

[60]  33 U.S.C. § 903(a) (emphasis added).

[61]  33 U.S.C. § 905(a).

[62]  Id.

quo of the LHWCA, an employee who is eligible for benefits is stripped of his right to sue "at law or in admiralty" in exchange for gaining "a certain, but limited, recovery under a strict liability regime."[63] As the Supreme Court has explained,

> the LHWCA represents a compromise between the competing interests of disabled laborers and their employers. The use of a schedule of fixed benefits as an exclusive remedy in certain cases is consistent with the employees' interest in receiving a prompt and certain recovery for their industrial injuries as well as with the employers' interest in having their contingent liabilities identified as precisely and as early as possible.[64]

As we have previously held in Hernandez that an undocumented immigrant employed as a longshoreman has the right to sue a vessel owner in tort for negligence, it follows that Rodriguez must have the corresponding right, viz., the right to recover workers' compensation benefits under the LHWCA.[65] Indeed, the remedy provided by the LHWCA is merely a substitute for the negligence claim that an employee could otherwise bring against his employer in tort. As one court has observed, "it would not only be illogical but it would also serve no discernable purpose to accord illegal aliens the right to bring affirmative claims in tort for personal injury but deny them the right to pursue the substitutionary remedy for personal injuries sustained in the workplace."[66]

---

[63] Taylor v. Bunge Corp., 845 F.2d 1323, 1326 (5th Cir. 1988).

[64] Potomac Elec. Power Co. v. Director, OWCP, 449 U.S. 258, 282 (1980).

[65] See Hernandez v. M/V Rajaan, 841 F.2d 582, amended after rehearing, 848 F.2d 498 (5th Cir. 1988).

[66] Mendoza v. Monmouth Recycling Corp., 672 A.2d 221, 225 (N.J. Super. Ct. App. Div. 1996). Given that the LHWCA embodies a quid pro quo, we also question whether undocumented immigrants not eligible for benefits would be bound by the LHWCA's

In a closely analogous case, the Court of Appeals of New York held that a minor employee who had lied about his age to obtain employment could not sue his employer in tort because the employee — despite his illegal act in falsifying his age — was covered by that state's workers' compensation statute, which contained an exclusivity provision protecting the employer from liability in tort.[67] This venerable holding remains unchanged and is particularly relevant today: As the Supreme Court has noted, the LHWCA was largely patterned on New York's workers' compensation statute.[68] Thus, in Mellen v. H.B. Hirsch & Sons, Inc., the D.C. Circuit looked to New York law to determine whether an illegally-employed minor working as a longshoreman could sue his employer in tort.[69] Basing its analysis largely on New York courts' interpretations of that state's workers' compensation statute, the court in Mellen held that the minor — despite having subverted child labor laws to obtain employment — was covered under the LHWCA and was thus subject to the LHWCA's exclusivity provision barring him from proceeding in tort.[70]

### 3. The LHWCA expressly provides for the award of benefits to nonresident aliens

exclusivity provision.

[67] See Noreen v. William Vogel & Bros., Inc., 231 N.Y. 317, 319-22 (1921).

[68] See Potomac Elec. Power Co. v. Director, OWCP, 449 U.S. 268, 274 (1980). As the Court explained, "[n]othing in the original legislative history of the [LHWCA] or in the legislative history of subsequent amendments indicates that Congress did not intend the plain language of the federal statute [and its exclusivity provision] to receive the same construction as the substantially identical language of its New York ancestor." Id.

[69] 159 F.2d 461, 461 (D.C. Cir. 1947).

[70] Id.

Finally, and perhaps most importantly, awarding benefits to an undocumented worker under the LHWCA does not appear to "unduly trench upon explicit statutory prohibitions critical to federal immigration policy."[71] This is because the LHWCA expressly provides for the award of benefits to nonresident aliens.[72] In Hoffman, the Court noted as particularly troubling that the NLRB's award of backpay undermined federal immigration policy by encouraging — and even rewarding — continued violations of the IRCA.[73] The Court was critical of the backpay award in part because the employee in that case qualified for the award "only by remaining inside the United States illegally." The Court also noted that the employee was unable to mitigate his damages as required by law without "triggering new IRCA violations, either by tendering false documents to employers or by finding employers willing to ignore IRCA and hire illegal workers."[74]

There is no parallel tension in the instant case, however, because LWHCA claimants are not required to mitigate their damages by working. Rather, the LHWCA provides that an employee's compensation rate may be reduced if the employer can demonstrate that the employee is physically capable of returning to work. Moreover, the LHWCA, by its express terms, does not require claimants to remain in the United States.[75] Indeed, the LHWCA specifies that

---

[71] See Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 147 (2002).

[72] Id. at 152.

[73] Id.

[74] Id.

[75] 33 U.S.C. § 905(g).

nonresident aliens and aliens who are about to become nonresidents "shall be" entitled to compensation in the same amount as provided for residents.[76] Thus, Rodriguez's eligibility to receive benefits is in no way contingent on his continuing to violate the IRCA or evade immigration authorities. Neither is Rodriguez being "rewarded" for a past violation of the IRCA, as workers' compensation is not backpay, but compensation for an injury incurred.

In sum, having reviewed the statutory text of the LHWCA, our precedential decision in Hernandez, and the Supreme Court's recent decision in Hoffman, we are convinced that Rodriguez is eligible to receive benefits under the LHWCA.

D.    The ALJ's factual findings

Bollinger next urges that, even if Rodriguez is eligible to receive workers' compensation benefits, the ALJ erred in determining, inter alia, the amount and extent of those benefits. As stated above, if the BRB has affirmed an order of the ALJ, we need only inquire whether the BRB "correctly concluded that the [ALJ's] order was supported by substantial evidence on the record as a whole and is in accordance with the law."[77] As sole factfinder, the ALJ "is entitled to consider all inferences [and his] selection among inferences is conclusive if supported by the evidence and the law."[78] Having thoroughly reviewed the record evidence, we are satisfied that the BRB correctly determined that the ALJ's findings are based on substantial evidence.

---

[76]  Id.

[77]  Ingalls Shipbuilding, Inc. v. Director, OWCP, 991 F.2d 163, 165 (5th Cir. 1993).

[78]  Mendoza v. Marine Pers. Co., Inc., 46 F.3d 498, 500-01 (5th Cir. 1995) (internal quotation marks and citations omitted).

## IV. CONCLUSION

Bollinger's petition for review is, in all respects, DENIED.

GARWOOD, Circuit Judge, concurring in the result.

I concur in the result. The ALJ and the BRB both rejected Bollinger's reliance on Rodriguez's being an illegal alien subject to deportation under the 1986 Immigration Reform and Control Act, on the basis that Bollinger had not established that Rodriguez "was about to be deported or would surely be deported" as provided in our opinion on rehearing in Hernandez v. M/V Rajaan, 848 F.2d 498, 500 (5ᵗʰ Cir. 1988). There we stated:

> "The question here is whether, given Hernandez's status as an illegal alien, the district court's decision to grant damages to Hernandez for future lost wages based upon his employment status at the time of injury and for the lengthy period preceding injury was clearly erroneous. . . . We conclude that it was not.
>
> The burden of proof in the calculation of damages was initially on Hernandez who had to establish the damages his injury had caused and was likely to cause in the future. Once Hernandez proved his prior wages in the United States, the burden shifted to Dianella [the vessel owner] to establish that the use of past wages to calculate future damages was factually improper and, if so, what a proper measure of damages should be. Because Dianella presented no proof that Hernandez was about to be deported or would surely be deported, the court did not err in basing its award on Hernandez's past earnings stream. Dianella is liable to make Hernandez whole for the injury inflicted. It cannot defeat his right to recover by asserting that his award for future lost wages should be based upon speculation regarding what he might be earning were he in Mexico."

While it is true that *Hernandez* was a suit under 33 U.S.C. § 905(b), that does not serve to distinguish it for these purposes, because, as the director points out, § 905(b) actions are only available to those covered under the LHWCA. Bollinger does not dispute that.

The record contains no evidence that Rodriguez is, or was when he was injured in October 2003, or has been at any time since then, "about to be

deported" or "would surely be deported," and Bollinger makes no meaningful contention otherwise. Accordingly, we are bound by Hernandez. I would leave it at that.