AFFIRM; Opinion issued December 21, 2012.



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-10-00843-CV

## GROCERS SUPPLY, INC. AND JOSE NARCISO SANCHEZ, Appellants

### V.

## JOSE LUIS CABELLO, ANGEL CABELLO, AND RAMIRO CABELLO, Appellees

On Appeal from the 68th Judicial District Court
Dallas County, Texas
Trial Court Cause No. 08-11463-C

# OPINION

Before Justices FitzGerald, Murphy, and Fillmore
Opinion By Justice Murphy

Grocers Supply, Inc. and its driver, Jose Narciso Sanchez, appeal a jury award of damages to brothers Jose, Angel, and Ramiro Cabello resulting from the collision of Grocers's tractor trailer with Angel's and Jose's pickup trucks. They contend federal law preempts submission of lost-wage claims of litigants who do not have the legal right to work in the United States. In three additional issues, they argue there was a lack of evidence to support future medical damages for Angel, a lack of evidence to support property damages for the Cabellos' trucks, and a failure of the trial court to award litigation costs based on an amended offer of settlement. In two cross-points, the Cabellos request sanctions for a frivolous appeal and reformation of the judgment due to a claimed typographical error. We affirm the trial court's judgment.

## BACKGROUND

The collision occurred on an interstate highway during the morning of June 15, 2008. Angel had just entered the freeway when he realized one of the tires on his Ford Ranger truck was flat. He turned on his emergency lights and pulled over to the right shoulder of the highway. He called his brothers Jose and Ramiro to help, and they arrived within ten to fifteen minutes in Jose's Ford F-150 truck. Angel's spare tire was already in use, so all three men left in Jose's truck to find a tire shop. When they returned, Jose turned on his emergency lights and parked his truck on the shoulder behind Angel's truck. The three men began changing the tire.

Just as they were finishing the tire change, the 18-wheel tractor-trailer driven by Sanchez struck the rear of Jose's truck. The impact pushed Jose's truck forward, causing it to collide with Angel's truck. Jose saw the tractor-trailer coming and was able to jump away from the truck, but he did not have time to warn his brothers. Angel and Ramiro were struck by one of the trucks. All three men suffered injuries, and the three vehicles caught fire and were damaged extensively. The freeway remained closed for several hours because of the accident.

The Cabellos filed a negligence suit against Grocers and Sanchez. The case was tried to a jury, which apportioned 85% of the liability to Sanchez and 15% to Jose. The damages questions answered by the jury included findings of $6,000 for lost wages and $5,000 for loss of earning capacity for Angel, $1,500 for loss of earning capacity for Ramiro, and $100 for lost wages to Jose (reduced to $85 based on the liability finding). The trial court rendered judgment based on the jury's liability and damages findings. This appeal followed.

## DISCUSSION

### ISSUE ONE: PREEMPTION

We begin our analysis with Grocers's first issue and will not distinguish between Grocers

–2–

and Sanchez unless context requires otherwise. Grocers frames the issue as "[w]hether federal law precludes the submission of lost wage claims of litigants who do not have the right to legally work in the United States." It argues under that issue that the trial court erred by excluding evidence of the Cabellos' "ineligibility to legally earn wages in the United States" and by submitting a jury question on lost past and future wages. The parties agree for purposes of our analysis of Grocers's first issue that the Cabellos were present in the United States illegally.

Grocers relies on the Immigration Reform and Control Act (IRCA), as interpreted by the United States Supreme Court's decision in *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137 (2002), for purposes of its preemption argument. Specifically, it argues IRCA preempts Texas tort law and precludes any damage awards to the Cabellos for lost wages and loss of earning capacity because of their undocumented status. In supplemental briefing following oral submission, it also relies on the recent Supreme Court decision in *Arizona v. United States*, 567 U.S. —, 132 S. Ct. 2492 (2012), to argue that "IRCA has preempted the field of regulation of employment of illegal aliens." We conclude IRCA does not preempt Texas tort law in the context presented.

### Standard of Review and Applicable Law

Federal preemption of state law is an affirmative defense, which presents a legal question for de novo review. *See Comcast Cable of Plano, Inc. v. City of Plano*, 315 S.W.3d 673, 677 (Tex. App.—Dallas 2010, no pet.) (affirmative defense); *Skilled Craftsmen of Tex., Inc. v. Tex. Workers' Comp. Comm'n*, 158 S.W.3d 89, 93 (Tex. App.—Austin 2005, pet. dism'd) (de novo review). Grocers, as the party asserting preemption, has the difficult burden of demonstrating the defense applies and overcoming the presumption against preemption. *Great Dane Trailers, Inc. v. Estate of Wells*, 52 S.W.3d 737, 743 (Tex. 2001).

The relevant inquiry for this Court is whether Congress intended to preempt tort-based damage awards for lost wages and loss of earning capacity when it enacted IRCA. We begin our analysis with a review of the relevant preemption principles followed by a review of IRCA and the relevant Supreme Court decisions in *Hoffman* and *Arizona*.

*Preemption Principles*

The preemption defense is predicated on the Supremacy Clause of the United States Constitution and the sovereignty of the States in our federal system. That clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. As a result, a state law is preempted and without effect if it falls within an area reserved to federal law. *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981); *Hyundai Motor Co. v. Alvarado*, 974 S.W.2d 1, 4 (Tex. 1998).

Courts have identified three ways in which federal law may preempt state law—express preemption, field preemption, and conflict preemption. Express preemption occurs when Congress enacts a statute explicitly preempting state law. *See, e.g., Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992); *Great Dane Trailers*, 52 S.W.3d at 743. Field and conflict preemption result from implicit congressional action. Specifically, field preemption exists when the federal scheme is so pervasive it gives rise to a reasonable inference that Congress left no room for the state to supplement the law or when federal law touches a field in which the federal interest is so dominant that we will assume enforcement of state laws on the same subject is precluded. *Hyundai Motor Co.*, 974 S.W.2d at 9 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Conflict preemption exists when a federal law preempts state law either because it is impossible for a private party to comply with both state and federal requirements or because state law stands as an obstacle

to the accomplishment and execution of the full purposes and objectives of Congress. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995); *Hyundai Motor Co.*, 974 S.W.2d at 4. Judicial action that undermines federal law is subject to the same preemption principles. *See Macmillan v. Redman Homes, Inc.*, 818 S.W.2d 87, 95 (Tex. App.—San Antonio 1991, writ denied).

*Presumption against Preemption*

All preemption cases begin with the presumption that Congress did not preempt state law. *Graber v. Fuqua*, 279 S.W.3d 608, 611 (Tex. 2009). "Because the States are independent sovereigns in our federal system, courts have long presumed that Congress does not cavalierly preempt state law causes of action." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *Graber*, 279 S.W.3d at 611. Congress's power to impose its will on the States and supplant state law is "an extraordinary power in a federalist system." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Thus, the Supreme Court has mandated that courts are not to conclude congressional ouster of state law in the absence of an unambiguous mandate to that effect. *Hyundai Motor Co.*, 974 S.W.2d at 13 (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146–47 (1963)). This analytical framework is crucial in our federal system, "for if in close or uncertain cases a court proceeds to preempt state laws where that result was not clearly the product of Congress's considered judgment, the court has eroded the dual system of government that ensures our liberties, representation, diversity, and effective governance." *Hyundai Motor Co.*, 974 S.W.2d at 5 (quoting KENNETH STARR ET AL., THE LAW OF PREEMPTION: A REPORT OF THE APPELLATE JUDGES CONFERENCE (American Bar Association, 1991)) (internal quotations omitted). Consequently, congressional intent is paramount in a preemption analysis. *MCI Sales & Serv., Inc. v. Hinton*, 329 S.W.3d 475, 482 (Tex. 2010); *Comcast Cable of Plano*, 315 S.W.3d at 677. Congress's intent is discerned primarily from the language of the statute claimed to preempt state law and the statutory framework surrounding it. *Medtronic*, 518

U.S. at 486; *Gade v. Nat'l Solid Wastes Mgmt. Ass'n.*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in judgment). Also relevant is the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law. *Medtronic*, 518 U.S. at 486.

Based on a state's sovereignty and its power to regulate public health and safety, the presumption against preemption can be no stronger than where a state exercises its authority in those matters. *See id.* at 485 (based on state sovereignty, courts have long presumed "Congress does not cavalierly preempt state law causes of action"); *see also Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985) ("[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern."). Common law negligence actions involve the state's power to regulate health and safety. *Great Dane Trailers*, 52 S.W.3d at 743. Thus, courts assume that a federal statute has not supplanted state law in these areas unless Congress has clearly manifested such intent. *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995).

*The Immigration Reform and Control Act of 1986—IRCA*

Under pre-1986 federal immigration law, it was not unlawful for an employer to hire an alien who was present or working in the United States without appropriate authorization. *See Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 892–93 (1984). But "[c]onfronting a large-scale influx of undocumented aliens, Congress concluded that the most humane, credible and effective way to respond to the problem was to penalize those employers who hired illegal aliens." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 231 (2d Cir. 2006) (internal quotations omitted). IRCA thus was designed by Congress to be a comprehensive scheme prohibiting the employment

–6–

of illegal aliens in the United States. *Hoffman*, 535 U.S. at 147. In enacting IRCA, Congress forcefully made combating the employment of illegal aliens central to the policy of immigration law. *Id.* Under section 1324a of the Act, employers may not knowingly hire, recruit, refer, or continue to employ unauthorized workers; if an employer discovers that an employee is an undocumented alien, the employer must fire that person. 8 U.S.C. § 1324a(1)(A), (a)(2); *Arizona*, 132 S. Ct. at 2504. These employer sanctions were intended to "reduce the flow of illegal immigration into the United States by removing the employment 'magnet' that draws undocumented aliens into the country." *Montero v. I.N.S.*, 124 F.3d 381, 384 (2d Cir. 1997) (quoting H.R. REP. NO. 99-682(I), at 45–46 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5649–50).

Central to IRCA's regulatory scheme is an employment verification system designed to deny employment to aliens who (1) are not lawfully present in the United States, or (2) are not lawfully authorized to work in the United States. 8 U.S.C. § 1324a(h)(3); *Hoffman*, 535 U.S. at 147. All employers must verify the identity and eligibility of all new hires by examining specified documents before they begin work. 8 U.S.C. § 1324a(b); *Hoffman*, 535 U.S. at 148. A person who is unable to provide proper documentation cannot be hired. 8 U.S.C. § 1324a(a)(1); *Hoffman*, 535 U.S. at 148. Congressional focus in establishing this regulatory scheme was primarily on the employer. *Bollinger Shipyards, Inc. v. Dir., Office of Worker's Comp. Programs*, 604 F.3d 864, 874 (5th Cir. 2010). Thus, IRCA's requirements are enforced through criminal penalties and an escalating series of civil penalties tied to the number of times an employer has violated IRCA's provisions. *Arizona*, 132 S. Ct. at 2504. While employers may face criminal penalties under IRCA, only civil penalties may be imposed on aliens who seek, or engage in, unauthorized employment. *Id.* Criminal penalties for employees are limited to those employees that obtain employment through fraudulent means. *Id.*

*Hoffman Plastic Compounds, Inc. v. NLRB*

The Supreme Court in *Hoffman* addressed the relationship between IRCA and the National Labor Relations Act, two federal statutes. Specifically, the lower court had denied an employer's petition for review of an order from the National Labor Relations Board in favor of an undocumented alien. *Hoffman*, 535 U.S. at 142. The employer had fired the employee when he began supporting unionization efforts. *Id* at 140. Finding this was an unlawful termination, the NLRB awarded backpay to the employee. On review, the Supreme Court vacated the NLRB's order. In doing so, it concluded that "awarding backpay to illegal aliens runs counter to policies underlying IRCA, policies the NLRB has no authority to enforce or administer." *Id.* at 149. The award therefore lay beyond the Board's remedial discretion. *Id.*

*Arizona v. United States*

Four provisions of state law affecting illegal immigration were at issue in *Arizona*, but only one provision implicated IRCA preemption claims by the government—Arizona's provision making it a criminal misdemeanor for "an unauthorized alien to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor . . . ." *Arizona*, 132 S. Ct. at 2503. In its review, the Supreme Court determined that IRCA's legislative background clearly demonstrated that Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment. *See id.* at 2504. The Court therefore held this part of the Arizona law to be preempted, concluding the state criminal penalties would "interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens." *Id.* at 2505. The Court determined the criminal penalties were in direct conflict with express IRCA provisions that allowed only civil penalties against unauthorized workers and, accordingly, the state law "to the contrary [was] an obstacle to the regulatory system Congress chose." *Id.*

**Analysis**

With this backdrop, we address the issue of whether IRCA preempts Texas tort law to preclude awards for lost wages and lost earning capacity to the Cabellos. That analysis requires that we consider express and implicit methods of preemption, apply a presumption against preemption, and remain mindful that the ultimate goal of our search is to determine if Congress intended to preempt state tort law when it enacted IRCA. *See Comcast Cable of Plano*, 315 S.W.3d at 677 (intent).

*Express Preemption*

Grocers concedes that IRCA contains no language that expressly preempts the Cabellos' awards for lost wages and loss of earning capacity. IRCA does contain an express preemption clause, but the clause is narrow and preempts only "State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." *See* 8 U.S.C. § 1324a(h)(2). Grocers does not suggest the Cabellos' damage awards for lost wages and lost earning capacity constitute civil or criminal sanctions or that the preemption clause is applicable. Likewise, we conclude express preemption does not apply to the preemption issue before this Court.

*Implicit Preemption*

Grocers does not explicitly identify in its initial briefing the type of implicit preemption it claims. In its supplemental brief, Grocers relies on *Arizona* to argue that field preemption applies to preclude the Cabellos' awards for lost wages and lost earning capacity. In doing so, it quotes part of the Court's statement in *Arizona* that the state law that imposed criminal penalties on aliens was "an obstacle to the regulatory system Congress chose." But "obstacle" preemption is traditionally a prong of conflict preemption, not field preemption, and we construe the Supreme Court's

–9–

conclusion in *Arizona*—that the Arizona-imposed criminal penalties against aliens themselves were "an obstacle" to Congress's regulatory system—as resting on conflict preemption principles rather than field preemption principles as urged by Grocers. While field and conflict preemption are distinct concepts, we recognize the categories are "not rigidly distinct" and semantics do not always control a court's analysis in this area. *Graber*, 279 S.W.3d at 611. We thus decline to apply a rigid analysis to Grocers's framing of its preemption issue and will examine whether IRCA preempts state tort law under both categories of implicit preemption.

Under established preemption principles, we first indulge a presumption that Congress did not intend to preempt state law. *Medtronic*, 518 U.S. at 485; *Graber*, 279 S.W.3d at 611. In that context—and because the purpose of Congress is the ultimate touchstone in every preemption case—we must examine Congress's purpose in enacting IRCA. *See generally Medtronic*, 518 U.S. at 485 (Congress's purpose is the ultimate touchstone in every preemption case); *United States v. Alabama*, 691 F.3d 1269, 1285 (11th Cir. 2012) (noting courts must first examine Congress's intent); *Comcast Cable of Plano*, 315 S.W.3d at 677 ("A preemption analysis is an inquiry into congressional intent.").

Courts that have discussed IRCA have described its purposes similarly. The Supreme Court has stated that, by enacting IRCA, Congress forcefully made combating the employment of illegal aliens central to the policy of immigration law. *Hoffman*, 535 U.S. at 147; *see also Arizona*, 132 S. Ct. at 2505 (identifying the deterrence of unlawful employment as one of the goals of IRCA). The Second Circuit Court of Appeals has emphasized IRCA's legislative history, stating its "primary purpose . . . was to reduce the flow of illegal immigration into the United States by removing the employment 'magnet' that draws undocumented aliens into the country." *Montero*, 124 F.3d at 384 (quoting House Report discussing passage of IRCA). The Court of Appeals of New York, quoting

President Ronald Reagan when he signed IRCA into law, stated that the IRCA-established employer sanctions were "intended to remove the incentive for illegal immigration by eliminating the job opportunities which draw illegal aliens into the country." *Balbuena v. IDR Realty LLC*, 6 N.Y.3d 338, 353, 845 N.E.2d 1246, 1253 (2006); *see also United States v. Todd Corp.*, 900 F.2d 164, 165 (9th Cir. 1990) (noting the provisions of IRCA that were intended to discourage the employment of unauthorized aliens).

What all these descriptions of IRCA's purpose make clear is that Congress—in deciding the best way to combat illegal immigration—chose to focus on the employment of undocumented aliens, hoping to remove the incentive for illegal immigration by eliminating the job opportunities that draw illegal aliens into the country. As the Supreme Court stated in *Hoffman*, "[u]nder the IRCA regime, it is impossible for an undocumented alien to obtain employment in the United States without some party directly contravening explicit congressional policies." *Hoffman*, 535 U.S. at 148.

We thus turn to the question of whether Congress's goal of combating illegal immigration by removing employment opportunities pursuant to IRCA included the intent to preempt state tort laws that allow recovery for wage-related injuries when the injured person is present in the United States illegally. First looking to whether field preemption applies, we must determine whether Congress, by enacting IRCA, so thoroughly occupied a legislative field that there is no room left for the States to supplement the law. *Cipollone*, 505 U.S. at 516. Grocers states that the federal government's power to "regulate issues relating to immigration and naturalization is so comprehensive that a state may not interfere with that regulation." As for the field of immigration, we agree with Grocers that the power to regulate immigration is unquestionably a federal power. *DeCanas v. Bica*, 424 U.S. 351, 354 (1976), *superseded by statute*, IRCA, *as recognized in Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1975 (2011). And the Supreme Court has

–11–

reiterated that Congress has broad, "undoubted" power over the subject of immigration and the status of aliens, leaving little room for the States to maneuver in that field. *See Arizona*, 132 S. Ct. at 2498. But while Congress may thoroughly regulate immigration and naturalization law, immigration is a distinct and separate field from state tort law. *See Madeira*, 469 F.3d at 240 ("[I]mmigration is plainly a field in which the federal interest is dominant . . . . State tort and labor laws, however, occupy an entirely different field."); *Vargas v. Kiewit La. Co.*, No. H-09-2521, 2012 WL 2952171, at *3 (S.D. Tex. July 18, 2012) ("[A]lthough Congress's interest is pervasive and dominant in immigration, tort and labor are areas that traditionally have been left to the states to regulate."). Texas tort law does not attempt to supplement the immigration and naturalization field. Thus, we cannot conclude Congress has implicitly preempted the field of state tort law by enacting IRCA.

Grocers also argues in its supplemental brief that IRCA has preempted the "field of regulation of employment" of illegal aliens. Assuming such a defined field exists, it would not apply here. This case does not involve the regulation of the Cabellos' or Grocers's employment. Rather, it involves the Cabellos' recovery of damages as the result of being injured in a vehicular accident not involving their employment or their employer. Accordingly, field preemption is inapplicable to our resolution of Grocers's issue.

Next considering conflict preemption as part of our analysis, we must determine whether state tort law presents an actual conflict with IRCA because either (1) compliance with IRCA and allowing lost wages to illegal aliens is a "physical impossibility" or (2) Texas tort law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Arizona*, 132 S. Ct. at 2501. Grocers argues that "when the statute or common law at issue is incongruous with the goals and objectives of federal legislation, there can be no other conclusion than that the statute or common law principle is preempted by the action of Congress." It also argues

that "permitting an award [of lost wages and lost earning capacity] would stand as an obstacle to the regulatory system Congress chose."

The first conflict prong, or "impossibility" preemption, is a demanding defense. *Wyeth v. Levine*, 555 U.S. 555, 573 (2009). We start again with the assumption that state police powers are not superseded absent a clear mandate from Congress. *MCI Sales & Serv.*, 329 S.W.3d at 487 (citing *Rice*, 331 U.S. at 230). State law will be superseded only where the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together. *Graber*, 279 S.W.3d at 611–12 (quoting *Kelly v. Wash. ex rel. Foss Co.*, 302 U.S. 1, 10–11 (1937)).

In this context, we address the question presented by impossibility preemption—whether a private party can independently do under federal law what state law requires of it. *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2579 (2011). It is not physically impossible for IRCA provisions prohibiting the employment of illegal aliens to stand with Texas law allowing all persons to recover damages for torts legally caused by the conduct of another. *See Vargas*, 2012 WL 2952171, at *3. Stated differently, providing damages for lost wages and loss of earning capacity and complying with IRCA are not physically impossible. *See id.*; *Madeira*, 469 F.3d at 247. Here, Grocers's responsibility for the Cabellos' wage-related damages resulting from its negligence does not require Grocers to violate or continue violating IRCA. *See Madeira*, 469 F.3d at 247. The Cabellos' tort case does not arise out of or relate in any way to Grocers's employment of illegal workers. While IRCA makes it unlawful for Grocers knowingly to hire an illegal alien, Grocers's payment of damages to these third parties resulting from Grocers's negligence—even lost wages and lost earning capacity—does not violate IRCA. Physical impossibility is thus not present here.

Contrast the Cabellos' claim with a situation where a trial court orders reinstatement of an undocumented worker who was fired for reporting illegal activity of the employer. In that situation,

it would be impossible for the employer to comply with both the trial court's judgment and IRCA because the rehiring of the illegal worker would violate IRCA. *See, e.g., Madeira*, 469 F.3d at 242–43. No such physical impossibility exists here. Thus, under this prong of preemption analysis, Texas tort law allowing the Cabellos' awards for lost wages and lost earning capacity is not in conflict with IRCA.

Divining congressional intent can be more challenging when preemption is premised on the second conflict prong, which is where a state law stands as an obstacle to accomplishing a federal purpose. *MCI Sales & Serv.*, 329 S.W.3d at 482–83. We are guided in our analysis by the United States Supreme Court. The Court has specifically instructed that "[i]mplied preemption analysis does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives; such an endeavor would undercut the principle that it is Congress rather than the courts that preempts state law." *Whiting*, 131 S. Ct. at 1985 (quoting *Gade*, 505 U.S. at 111); *see also MCI Sales & Serv.*, 329 S.W.3d at 483. Courts therefore must approach this interpretive task cautiously, applying a high threshold for concluding a state law is to be preempted for conflicting with the purposes of a federal statute. *Gade*, 505 U.S. at 110 (Kennedy, J., concurring in part and concurring in judgment).

Congress's purpose in enacting IRCA has been quoted extensively as combating illegal immigration by halting employer incentives, both by criminal penalties and an escalating series of civil penalties. *Arizona*, 132 S. Ct. at 2504. Damage awards to tort victims in Texas, however, do not implicate the number of job opportunities available to undocumented aliens and neither increase nor decrease the opportunities for undocumented aliens to find employment in the United States. If anything, it could be argued employers might have a higher incentive for hiring illegal aliens if Congress superseded liability for those individuals' injuries. *See, e.g., Balbuena*, 6 N.Y.3d at 359,

845 N.E.2d at 1257 ("An absolute bar to recovery of lost wages by an undocumented worker would lessen the unscrupulous employer's potential liability to its alien workers and make it more financially attractive to hire undocumented aliens.").

We have found no evidence Congress intended IRCA to combat illegal immigration by encroaching into the States' authority to regulate health and safety matters, and Grocers has presented none. *See Great Dane Trailers*, 52 S.W.3d at 743. Similarly, Grocers has not provided any evidence that damage awards in tort actions have any impact on the employment opportunities available to undocumented aliens. Any link between tort awards and job opportunities is thus speculative at best, and a speculative link will not support a preemption defense. *See Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982) ("The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute."); *English v. Gen. Elec. Co.*, 496 U.S. 72, 90 (1990) ("[P]re-emption is ordinarily not to be implied absent an 'actual conflict.'"); *see also Carlisle v. Philip Morris, Inc.*, 805 S.W.2d 498, 510 (Tex. App.—Austin 1991, writ denied) (concluding that a potential conflict "is too speculative to warrant preemption").

Most courts considering the issue of whether damage awards under state law thwart Congress's purpose have concluded similarly that potential damage awards are not meaningful incentives to draw illegal immigrants into this country. *See, e.g., Patel v. Quality Inn S.*, 846 F.2d 700, 704 (11th Cir. 1988) ("We doubt, however, that many illegal aliens come to this country to gain the protection of our labor laws. Rather it is the hope of getting a job at any wage that prompts most illegal aliens to cross our borders."); *Majlinger v. Cassino Contracting Corp.*, 25 A.D.3d 14, 23 n.1, 802 N.Y.S.2d 56, 66 (N.Y. App. Div. 2005), *aff'd sub nom. Balbuena*, 6 N.Y.3d 338, 845 N.E.2d 1246 (2006) ("Undocumented workers who immigrate to this country are motivated by the prospect of earning wages, not the prospect of being awarded back pay as a result of an illegal termination or

lost wages as a result of an injury."); *Asylum Co. v. Dist. of Columbia Dep't. of Emp't Servs.*, 10 A.3d 619, 633 (D.C. 2010) ("We think it unlikely that the availability of workers' compensation benefits in the event of a debilitating work injury in the United States would significantly affect an alien worker's decision about whether to enter this country in response to the already 'magnetic' force of the job market.").

The structure of IRCA, and recent decisions interpreting the Act, also suggest Congress did not intend to preempt state tort law. Specifically, Congress deliberately chose a regulatory framework in which it carefully weighed and balanced the penalties to impose. As part of that balance, Congress chose only those solutions determined to be most workable. *See Arizona*, 132 S. Ct. at 2504. For example, many courts have noted IRCA focuses primarily on the employer, and Congress chose sanctions on employers as the principal means of curtailing illegal immigration. *See Bollinger Shipyards*, 604 F.3d at 874 (noting primary focus on employer); *Madeira*, 469 F.3d at 231 (noting employer sanctions were centerpiece of immigration-reform effort; sanctions added only later for employees who knowingly or recklessly use false documents to obtain employment). Also, Congress specifically considered criminal penalties for aliens who sought or engaged in unauthorized work and rejected that option as unworkable. *Arizona*, 132 S. Ct. at 2504. Instead, IRCA's criminal sanctions for employees are reserved for those that use false documents to acquire their jobs. *Id.* Even when employees use false or fraudulent documents for purposes of obtaining employment, IRCA subjects those persons to fines and criminal prosecution but "provid[es] nothing regarding *civil* effects." *Bollinger Shipyards*, 604 F.3d at 874. Congress chose express preemption of state and local laws only as to employer sanctions for hiring unauthorized aliens. It is telling, given this carefully considered framework, that nowhere did Congress suggest that it was preempting, or even attempting to affect, state tort law claims to remove incentives for illegal aliens to enter the United

States. *See Medtronic*, 518 U.S. at 491 (concluding congressional silence regarding the preemption of common law remedies indicated that Congress did not preempt state law).

Given that IRCA sought to limit job opportunities for illegal aliens, a preemption defense is especially attenuated where, as here, the party arguing preemption is not an employer or possible employer, but a third-party tortfeasor. "Nothing in IRCA demands, or even implies, that tortfeasors should not be held liable for their negligence if the person whom they harm is working in this country illegally or has violated IRCA." *Vargas*, 2012 WL 2952171, at *3; *see also Madeira*, 469 F.3d at 242 (noting duties of tortfeasor under common law are unrelated to, and do not depend on, a worker's compliance with federal immigration laws). Simply stated, the immigration status of the Cabellos does not change Grocers's duty of care or the damages resulting from its negligence. Requiring Grocers, a third-party tortfeasor with no employment connection to the Cabellos, to pay damages—including damages based on lost wages and lost earning capacity—creates no obstacle to congressional purpose, because that requirement will neither increase nor decrease the employment opportunities afforded to illegal aliens. Similarly, there is no suggestion that potential damages resulting from third-party torts create incentives for illegal immigration.

While we recognize some tension between allowing illegal aliens to recover wage-related damages while imposing penalties under IRCA for illegal employment of aliens, IRCA's legislative history shows that Congress anticipated some conflict. *See Montero*, 124 F.3d at 384 (quoting House Report discussing passage of IRCA that noted "[i]t is not the intention of the Committee that the employer sanctions provisions of the bill be used to undermine or diminish in any way labor protections in existing law . . . ."). Tension, however, is not obstruction. "The mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power." *Madeira*, 469 F.3d

–17–

at 241; *see also Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 256 (1984) (recognizing tension between state and federal law but nonetheless finding federal law did not preempt state tort law). Instead, when Congress has recognized the potential for tension between state law and federal statutes and has decided to accept whatever tension may exist, courts likewise must accept that tension. *See Silkwood*, 464 U.S. at 256. Here, whatever tension may exist between penalizing employers who hire illegal aliens and allowing wage-based tort damages to illegal aliens who are the victims of third-party tortious conduct is not so substantial that these damage awards frustrate Congress's goal.

For its preemption argument, Grocers relies predominantly on *Hoffman* and some federal and state court opinions in which courts have concluded lost wages are barred or otherwise preempted by IRCA. We recognize that courts are not uniform on this issue. *See generally Wielgus v. Ryobi Techs., Inc.*, No. 08 CV 1597, 2012 WL 2367883, at *5 (N.D. Ill. June 21, 2012) (citing cases). We conclude, based on our analysis, that *Hoffman* does not mandate preemption of the Cabellos' lost wage and earning capacity claims. First, *Hoffman* was not a preemption case. The Supreme Court in that case was addressing the relationship between IRCA and the NLRA, two federal statutes, and an employer's illegal firing of an illegal alien. Federalism concerns were neither at issue nor addressed. *See Tyson Foods, Inc. v. Guzman*, 116 S.W.3d 233, 244 (Tex. App.—Tyler 2003, no pet.); *Madeira*, 469 F.3d at 237.

*Hoffman* also was decided on limited grounds. The question before the Supreme Court was whether the NLRB had the discretion to "select and fashion remedies for violations of the NLRA" that were in conflict with "policies underlying IRCA." *Hoffman*, 535 U.S. at 142, 149. In that case, the NLRB had fashioned a remedy of awarding back pay to an employee after his illegal firing. Discussing the history of NLRB remedies that were "generally broad," the Court noted that the

NLRB's discretion was not unlimited. *Id.* at 142–43. Central to the Supreme Court's decision was the principle that the NLRB "had no authority to enforce or administer" policies underlying IRCA—a statute far removed from its expertise—and its award of back pay lay "beyond the bounds of the Board's remedial discretion." *Id.* at 149. The Court re-emphasized that "any 'perceived deficienc[y] in the NLRA's existing remedial arsenal' must be 'addressed by congressional action,' not the courts." *Id.* at 152 (quoting *Sure-Tan*, 467 U.S. at 904).

Contrast *Hoffman* with the Cabellos' tort claims and the jury's awards. We are not presented with a question of discretionary authority of a federal agency such as the NLRB to fashion remedies for violation of a federal act—discretion the Supreme Court previously had held to be limited. We are instead presented with the question of federal preemption of the field of common law torts—a field where States are traditionally given great latitude on state sovereignty grounds. *See Medtronic*, 518 U.S. at 475. In *Hoffman*, the Supreme Court emphasized its consistent holdings giving little or no deference to NLRB-fashioned remedies that exceeded the Board's remedial discretion. *Hoffman*, 535 U.S. at 149. The threshold we must apply for determining that IRCA has implicitly preempted Texas common law is far higher than the threshold for determining whether a federal agency acted beyond its remedial discretion. *Hoffman* is not controlling here.

Most courts examining the decision in *Hoffman*—including Texas courts addressing the issue of preemption—have given it a narrower reading than Grocers urges. *See, e.g., Tyson Foods*, 116 S.W.3d at 244; *Balbuena*, 6 N.Y.3d at 357, 845 N.E.2d at 1256; *Cont'l PET Techs., Inc. v. Palacias*, 269 Ga. App. 561, 562-63, 604 S.E.2d 627, 630 (Ga. Ct. App. 2004). As the Tyler Court of Appeals concluded in *Tyson Foods*, *Hoffman* "only applies to an undocumented alien worker's remedy for an employer's violation of the NLRA and does not apply to common-law personal injury damages." *Tyson Foods*, 116 S.W.3d at 244. The Georgia court in *Palacias* also noted that, "[a]lthough the

IRCA and accompanying regulations address in detail the hiring of undocumented aliens, they do not purport to intrude into the area of what protections a State may afford these aliens." *Palacias*, 604 S.E.2d at 630. Similarly, the New York court observed and concluded that "IRCA and related statutes [thoroughly] occupy the spectrum of immigration laws. But there is nothing in those provisions indicating that Congress meant to affect state regulation of occupational health and safety, or the types of damages that may be recovered in a civil action arising from those laws." *Balbuena*, 6 N.Y.3d at 357, 845 N.E.2d at 1256; *see also Wielgus*, 2012 WL 2367883, at *7 (concluding Congress, by passing IRCA, did not implicitly preempt state law by entirely occupying the field of common law torts).

The Supreme Court's recent decision in *Arizona* does not alter our conclusion. While *Arizona* was a preemption case, the challenged state-law provision was in direct conflict with IRCA. Specifically, the questioned Arizona law made it a criminal misdemeanor for an unauthorized alien knowingly to apply for work, solicit work in a public place, or perform work as an employee or independent contractor in Arizona. *Arizona*, 132 S. Ct. at 2497–98. In its review, the Supreme Court determined that IRCA's legislative background clearly demonstrated Congress's deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment. *See id.* at 2504. It concluded that the Arizona provision imposing criminal penalties would "interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens." *Id.* at 2505. Because Congress had, after substantial debate, determined that criminal penalties against aliens who seek unauthorized employment would be inappropriate, "it follows that a state law to the contrary is an obstacle to the regulatory system Congress chose." *Id.* The Court thus concluded the criminal penalties provision was preempted by IRCA.

*Arizona* did not involve, and the Supreme Court did not address, state tort laws allowing damages to persons injured as a result of another's negligence. Texas law allows such recovery without reference to citizenship or work permits. *See Tyson Foods*, 116 S.W.3d at 244 ("Texas law does not require citizenship or the possession of immigration work authorization permits as a prerequisite to recovering damages for lost earning capacity."); *Wal-Mart Stores, Inc. v. Cordova*, 856 S.W.2d 768, 770 n.1 (Tex. App.—El Paso 1993, writ denied) ("The current state of Texas law does not require citizenship or the possession of immigration work authorization permits as a prerequisite to recovering damages for loss of earning capacity, nor will this Court espouse such a theory."). Significantly, the Court did not purport to alter its prior recognition that the mere fact that aliens are subject to state law does not mean such laws regulate immigration and thus are preempted under Congress's exclusive power to legislate and regulate immigration and naturalization. *See DeCanas*, 424 U.S. at 355. Instead, it is well recognized that state tort law occupies an entirely different field from immigration and naturalization. *Madeira*, 469 F.3d at 240.

The concerns that formed the "background for the formal legal analysis" performed by the Supreme Court in *Arizona* also were not tied to employment of illegal aliens. *Arizona*, 132 S. Ct. at 2500. The Court cited the concerns as an "'epidemic of crime, safety risks, serious property damage, and environmental problems' associated with the influx of illegal migration across private land near the Mexican border." *Id.* The issue addressed by the Court was "whether, under preemption principles, federal law permits Arizona to implement the state-law provisions in dispute." *Id.* There were four separate provisions, only three of which the Court determined were preempted.

One of the provisions created a new state misdemeanor for "willful failure to complete or carry an alien registration document . . . in violation of 8 United States Code section 1304(e) or

1306(a)." *Id.* at 2501 (citations omitted). The Court concluded, as it had in prior cases, that federal law has preempted "the field of alien registration." *Id.* at 2502. The second provision in dispute was the misdemeanor described above, which the Court concluded was in direct conflict with IRCA and an "obstacle to the regulatory system Congress chose." *Id.* at 2505. The third provision provided that a state officer, "without a warrant, may arrest a person if the officer has probable cause to believe . . . [the person] has committed any public offense that makes [him] removable from the United States." *Id.* (citations omitted). The Court observed that federal law specifies limited circumstances in which state officers may perform the functions of immigration officers. *Id.* at 2506. Emphasizing that "Congress has put in place a system in which state officers may not make warrantless arrests of aliens based on possible removability except in specific, limited circumstances," the Court concluded that the state law created "an obstacle to the full purposes and objectives of Congress" and thus was preempted. *Id.* at 2507 (citations omitted). The fourth provision required state officers to conduct a status check during a lawful detention or after release of a detainee. Because the law was not yet in effect and could be interpreted in different ways, the Court determined there was no need to address whether a proffered, but not yet applied, interpretation was preempted by federal law. *Id.* at 2509. It reasoned, based on state sovereignty and the presumption that state laws will be construed in such a way as to avoid doubtful constitutional questions, that the United States could not prevail in its pending challenge. *Id.* at 2510.

Contrary to Grocers's assertion that the Supreme Court in *Arizona* "made clear that the IRCA has preempted the field of regulation of employment of illegal aliens, and that state laws that pertain to that field are preempted," the only employment question addressed was whether Arizona law could create criminal penalties in direct contravention of IRCA. The Court's decision was limited to the conclusion the state law was an obstacle to congressional intent because of the express

–22–

dichotomy of civil and criminal penalties.

Were we to ignore preemption principles in our analysis and give *Hoffman* or *Arizona* a broader reading—a reading that IRCA preempted Texas law that does not require citizenship as a prerequisite to recovering damages for lost wages or lost earning capacity—the impact on our jurisprudence could be immense. The conclusion that IRCA preempts Texas law and precludes awards for lost wages and loss of earning capacity in this context could render many other laws suspect. As cautioned by the Supreme Court, courts must defer to Congress to state its clear and manifest intent to preempt state law, which it has not done in the context we have before us. To conclude otherwise would be a "freewheeling" judicial inquiry that would undercut the principle that it is Congress, not the courts, that preempts state law. *Whiting*, 131 S. Ct. at 1985.

In sum, nothing presented to this Court shows that Congress, by enacting IRCA, expressed a clear and manifest intent to supersede Texas tort law allowing recovery in the instance presented. Congress's power to regulate immigration cannot imply that every state law that might impact or touch on an undocumented alien is necessarily preempted. The Supreme Court acknowledged in *DeCanas* that not every state enactment that deals in some way with aliens is a regulation of immigration and thus per se preempted by Congress's power to regulate immigration. *DeCanas*, 424 U.S. at 355 (reviewing a line of cases standing for the proposition that "the fact that aliens are the subject of a state statute does not render it a regulation of immigration . . . ."). For this Court to conclude otherwise would run roughshod over state sovereignty and the Supreme Court's mandates for protecting the States' authority in our federal system. We overrule Grocers's first issue as to preemption.

We observe that Grocers also argues under its first issue that the trial court erred by excluding evidence of the Cabellos' "ineligibility to legally earn wages in the United States." A trial court's

decision to admit or exclude evidence is reviewed under an abuse of discretion standard. A trial court abuses its discretion when it acts arbitrarily, unreasonably, or without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–242 (Tex. 1985). Texas law does not require citizenship or the possession of immigration work authorization permits as a prerequisite to recovering tort damages. *See Tyson Foods*, 116 S.W.3d at 244; *Wal-Mart Stores*, 856 S.W.2d at 770 n.1. The sole basis urged by Grocers for admission of evidence of the Cabellos' legal status was that they were prohibited from legally earning income in the United States. It did not, for example, argue the evidence was relevant because the Cabellos were in danger of immediate deportation and the effect, if any, such deportation might have on future earning capacity. *See, e.g., Republic Waste Servs., Ltd. v. Martinez*, 335 S.W.3d 401, 409 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (concluding that while immigration status can be a relevant consideration in determining future earning capacity, the probative value of such evidence is outweighed by its prejudicial effect without a showing that plaintiff will likely be deported in his working lifetime).

A party seeking to reverse a judgment based on evidentiary error need not prove that but for the error a different judgment necessarily would have been rendered, but it must show that the error probably resulted in an improper judgment. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995). A successful challenge to evidentiary rulings usually requires the complaining party to show the judgment turns on the particular evidence excluded or admitted. *Id.* at 753–54. Grocers's appellate record is not clear regarding exactly what evidence it sought to introduce to the jury. Nor does it indicate, by offer of proof or otherwise, that Grocers attempted to introduce evidence that the Cabellos would likely be deported in their working lifetimes, *see Republic Waste Servs., Ltd.*, 335 S.W.3d at 409, or even that they were deportable. Given Grocers's limited

–24–

argument that the Cabellos were entitled to no lost-wage damages as a matter of law and the record it has presented, we cannot conclude the trial court abused its discretion by excluding unspecified evidence of the Cabellos' legal status in the United States.

ISSUE TWO: SUFFICIENCY OF EVIDENCE REGARDING FUTURE MEDICAL EXPENSES

The jury awarded $12,400 for future medical expenses to Angel. Grocers contends in its second issue that the trial court erred by submitting a question on future medical expenses because there was no competent evidence to support that submission. Grocers relies on the lack of medical testimony and asserts that testimony by Angel's psychologist regarding recommended counseling was insufficient to show the requirement or cost of any future sessions. The Cabellos argue that Grocers waived this issue by failing to object. We conclude that Grocers waived this issue.

**Applicable Law**

To preserve a legal sufficiency challenge for appeal after a jury trial, Grocers must have done one of the following: (1) moved for an instructed verdict; (2) moved for judgment notwithstanding the verdict; (3) objected to the submission of a jury question; (4) moved to disregard the jury finding; or (5) moved for a new trial. *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex.1991); *City of Dallas v. Redbird Dev. Corp.*, 143 S.W.3d 375, 385 (Tex. App.—Dallas 2004, no pet.). In a legal sufficiency review, we ask whether the evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Columbia Med. Ctr. Subsidiary, L.P. v. Meier*, 198 S.W.3d 408, 414 (Tex. App.—Dallas 2006, pet. denied). Anything more than a scintilla of evidence is legally sufficient to support a challenged finding. *Walker v. Cotter Props., Inc.*, 181 S.W.3d 895, 899 (Tex. App.—Dallas 2006, no pet.).

To complain on appeal about the factual sufficiency of the evidence after a jury trial, the party must present the specific complaint to the trial court in a motion for new trial. TEX. R. CIV. P.

324(b)(2), (3); *Cecil*, 804 S.W.2d at 510. When we review a finding for factual sufficiency, we consider all of the evidence and will set aside a finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Edwards v. Mid–Continent Office Distrib., L.P.*, 252 S.W.3d 833, 836 (Tex. App.—Dallas 2008, pet. denied).

## Analysis

It is not entirely clear whether Grocers is making a factual or legal sufficiency challenge to the award of future medical damages. We note, however, that Grocers did not file a motion for new trial, which is a prerequisite for a factual sufficiency challenge. TEX. R. CIV. P. 324(b)(2), (3); *Cecil*, 804 S.W.2d at 510. It therefore failed to preserve any factual sufficiency issues on appeal.

We also conclude Grocers waived any challenge to the legal sufficiency of the evidence. It did not file a motion for instructed verdict, for judgment notwithstanding the verdict, or for new trial based on a claim of legal insufficiency of the evidence. It did file a motion to disregard jury answers, but made no mention of future medical expenses. At the time of the charge conference, Grocers not only failed to object to the submission of a jury question on future medical damages for Angel, but its counsel specifically stated that "I do think there was evidence to support [future medical] for Angel." Additionally, counsel for Grocers notified the trial court in a letter following a post-trial hearing that she "should clarify that . . . our complaints are primarily with application of the law rather than the sufficiency of the evidence itself, except with regard to the issue of lost wages. We do not believe the evidence was factually or legally sufficient to support an award of lost wages." Grocers made no mention in this letter of any issue with future medical damages. While this letter does not constitute one of the recognized methods of preserving a legal sufficiency challenge mentioned in *Cecil*, it does demonstrate that Grocers was not considering Angel's award of future medical damages to be an issue. We overrule Grocers's second issue.

## ISSUE THREE: SEPARATE TRIAL ON PROPERTY DAMAGE

Grocers frames its third issue as "[w]hether the trial court erred in entering property damages in its final judgment despite the fact that no evidence of these damages was shown during trial." In its brief, however, Grocers argues the trial court abused its discretion when, instead of excluding an undisclosed witness, it "created its own procedure" by giving Grocers "two prejudicial options" of either trying property damages to the trial court after the jury's verdict or deposing the undisclosed witness during trial. Also, in the last paragraph of its argument, Grocers includes one sentence stating: "By forcing this choice upon [Grocers], [Grocers was] deprived of [its] constitutional right to a jury trial." We construe issue three as a procedural issue rather than a legal sufficiency challenge and will also address Grocers's argument concerning a constitutional right to a jury trial.

### Standard of Review and Applicable Law

Grocers's complaint implicates two different rules of civil procedure. First, under rule 193.6, a party who fails to make, amend, or supplement a discovery response in a timely manner may not use the undisclosed information unless the trial court finds (1) good cause for the failure, or (2) the failure will not unfairly surprise or prejudice the other parties. *See* TEX. R. CIV. P. 193.6(a). The party seeking to call an undisclosed witness has the burden of establishing good cause or the lack of unfair surprise or unfair prejudice. *Id.* 193.6(b). The trial court has discretion to determine whether the proponent has met its burden. *Brunelle v. TXVT Ltd. P'ship*, 198 S.W.3d 476, 477 (Tex. App.—Dallas 2006, no pet.). If the proponent fails to meet its burden, the undisclosed evidence or witness is excluded. TEX. R. CIV. P. 193.6(a). The trial court also has discretion under subsection (c) to grant a continuance or temporary postponement of trial to allow additional discovery, even in those circumstances where the proponent fails to meet its burden of establishing good cause, lack of unfair surprise, or unfair prejudice. *See* TEX. R. CIV. P. 193.6(c). The trial court's ruling under

–27–

rule 193.6 should not be disturbed on appeal absent an abuse of discretion. *See State v. Target Corp.*, 194 S.W.3d 46, 49 (Tex. App.—Waco 2006, no pet.) (citations omitted).

The second rule implicated by Grocers's issue is rule 174(b), which permits a trial court to order separate trials for any claim or separate issue "in furtherance of convenience or to avoid prejudice." *See* TEX. R. CIV. P. 174(b). An order for a separate trial leaves the lawsuit intact but enables the court to hear and determine one or more issues without trying all controverted issues at the same hearing. *Hall v. City of Austin*, 450 S.W.2d 836, 838 (Tex. 1970). An issue that is tried separately under rule 174 need not constitute a complete lawsuit in itself. *Kan. Univ. Endowment Ass'n v. King*, 350 S.W.2d 11, 19 (1961). The trial court's decision to grant a separate trial also is reviewed under an abuse of discretion standard. *Van Dyke v. Boswell, O'Toole, Davis & Pickering*, 697 S.W.2d 381, 384 (Tex. 1985).

### Analysis

Before the third day of trial began, the trial court heard argument outside the presence of the jury regarding the Cabellos' designation of a witness prepared to testify regarding the property value of their trucks, which were destroyed in the collision. The witness, Loren Joseph Weinstein, was not on the Cabellos' list of trial witnesses. Weinstein had been designated as a fact witness in amended and supplemental responses to Grocers's request for disclosure regarding the Cabellos' property damages. Grocers opposed the testimony, arguing Weinstein had not been designated as an expert, he was not on the witness list, and it "had no idea what his testimony will be based on to refute or rebut it to the jury."

The trial court determined that Grocers was "on notice that [the Cabellos] were making the claim, [Grocers] may not have known the exact amount but [it] knew that there was going to be a potential witness testifying," and then discussed options with the parties. The first option was to

allow Grocers to take Weinstein's deposition at lunch or later that night and then allow it to designate a rebuttal witness. The second option was to hold a separate trial on property damages, allow Grocers to get a rebuttal witness, and try the property damages to the court in a couple of weeks (or whatever time Grocers needed) if the jury found in favor of the Cabellos on liability. Grocers indicated it preferred the second option, and the Cabellos agreed. When the trial court then asked counsel for Grocers if she agreed to the procedure, she responded that "[s]ubject to the objection that we don't believe it's proper at all, that is our second alternative." After the jury returned a liability verdict in favor of the Cabellos, the parties filed a rule 11 agreement, *see* TEX. R. CIV. P. 11, identifying the property values for the trucks pursuant to Grocers's estimates.

Grocers does not cite or rely on rule 193.6 as the basis for its argument in its appellate brief. It does, however, cite cases relating to exclusion of expert testimony based on rule 193.6. According to Grocers, the trial court gave the Cabellos a choice between "two options that are not supported by Texas law" rather than follow proper procedure and require them to demonstrate good cause or lack of unfair surprise or prejudice.

Prior to giving the parties two options regarding how to handle the issue of property damages, the trial court heard the arguments of the parties, including the Cabellos' arguments regarding the previous disclosures, the pleadings, and the discussions of the parties regarding property damage. The trial court then found that it did not know how Grocers could argue surprise, as follows:

> The issue is whether or not there's surprise. Obviously, if there was a designation of an individual who's going to testify about this, and it's in the pleadings, and the fact there obviously was property damage, I'm not sure what the argument is going to be on surprise on this.

The trial court added, after offering Grocers the opportunity to depose Weinstein:

> And if they had just—if there had been no pleadings on this—if there had been no designation of the witness, I would probably have struck it. But given that you guys were on notice that they were making the claim, you may not have known the exact

amount but you knew that there was going to be a potential witness testifying.

The trial court had both the discretion to determine whether the Cabellos met their burden of showing lack of unfair surprise and, if not, to grant a continuance or temporary postponement of trial to allow additional discovery. The trial court found lack of unfair surprise. It also offered Grocers the option of deposing Weinstein and, if necessary, designating a rebuttal witness. When it offered Grocers that option, Grocers chose the option of submitting property damages to the trial court following the jury verdict. We conclude based on this record that Grocers has failed to show an abuse of discretion regarding the trial court's decision not to exclude Weinstein as a witness.

Our analysis does not end with whether the trial court abused its discretion by not excluding Weinstein as a witness. Grocers also argues that the separate trial on property damages was not permissible under the rules of civil procedure and that the choice it was "forced" into deprived it of its constitutional right to a jury trial. The Cabellos respond that the trial court had discretion to order a separate trial on damages and that any objection based on deprivation of a jury trial on that issue was waived.

Rule 174(b) permits a trial court to order a separate trial on any claim or issue in furtherance of convenience or to avoid prejudice. TEX. R. CIV. P. 174(b). That ruling should not be disturbed on appeal absent an abuse of discretion. *Iley v. Hughes*, 311 S.W.2d 648, 650 (Tex. 1958). Citing rule 193.6 for the first time in its reply brief, Grocers argues that the cases allowing for a separate trial "predate Rule 193.6" and "are rendered irrelevant by the creation of that rule." It argues the trial court's only option under rule 193.6 was exclusion or a continuance. We have resolved the portion of Grocers's issue regarding the trial court's discretion under rule 193.6 against it and therefore need not address its contention that rule 193.6 precludes a separate trial under rule 174(b). Grocers does not otherwise assert that the trial court abused its discretion by ordering a separate trial on property

damages pursuant to rule 174.

Grocers's remaining assertion under issue three, stated in one sentence in the last paragraph of its argument, is that the trial court deprived it of its constitutional right to a jury trial on the issue of property damages. The right to a trial by jury is guaranteed by the Texas and United States Constitutions. *See* U.S. CONST. amend. VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."); TEX. CONST. art. I, § 15 ("The right of trial by jury shall remain inviolate."). That right includes having the jury, as fact finder, decide both the question of damages and the amount of damages. *See Golden Eagle Archery v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003) (jury decides question of damages); *Burrell Eng'g & Constr. Co. v. Grisier*, 240 S.W. 899, 900 (Tex. 1922) (jury decides amount of damages).

The right to a jury trial in a civil case is not self-executing. A party requesting a trial by jury in a civil matter must specifically request a jury and comply with the requirements of rule 216. *See* TEX. R. CIV. P. 216 (outlining procedures for requesting a jury trial and paying necessary fee); *Sunwest Reliance Acquisitions Grp., Inc. v. Provident Nat'l Assurance Co.*, 875 S.W.2d 385, 387 (Tex. App.—Dallas 1993, no writ).

Here, the jury was selected, heard the trial, and rendered a verdict. There is no question that the right to a jury trial was perfected. *See Citizens State Bank of Sealy, Tex. v. Caney Invs.*, 746 S.W.2d 477, 478–79 (Tex. 1988) (finding perfected right to a jury trial under rule 216 when a demand for jury trial was filed and jury fee tendered in accordance with the rules). Once perfected, neither the judge nor a party may dispense with a jury over the objection of the party or parties adversely interested. TEX. R. CIV. P. 220; *Green v. W.E. Grace Mfg. Co.*, 422 S.W.2d 723, 725 (Tex. 1968). We therefore must determine whether Grocers forfeited its right to have the jury determine

both the fact and amount of property damages in this case.

Although the right to a jury trial is inviolate and one of the greatest rights guaranteed by our Texas and United States Constitutions, Grocers, as the complaining party, had to preserve that right to complain on appeal. *See Sunwest*, 875 S.W.2d at 387. In *Sunwest*, the trial court had deprived a party of the right to have a jury hear any part of its case, but the holding applies equally to this case. As stated:

> Although recognizing a trial court should safeguard the inviolate constitutional right to jury trial, we conclude a party is required to act affirmatively in order to preserve the right to complain on appeal that it was denied its perfected right to a trial by jury. Therefore, we hold that when a party has perfected its right to a jury trial in accordance with rule 216 but the trial court instead proceeds to trial without a jury, the party must, in order to preserve any error by the trial court in doing so, either object on the record to the trial court's action or indicate affirmatively in the record it intends to stand on its perfected right to a jury trial.

*Id.* at 387.

We must therefore examine the record to determine whether Grocers objected to the trial court's withdrawal of the case from the jury or indicated affirmatively that it intended to stand on the perfected right to a jury trial. *See id.*; *see also* TEX. R. APP. P. 33.1(a) (to preserve complaint for appellate review, party must present timely request, motion, or objection, state specific grounds for ruling sought, and obtain ruling); *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex.1991) (failure to make timely and specific objection waives error).

First, Grocers failed to include a complaint about a right to jury trial in its stated issues or summary of the argument. Rather, it appears to be an afterthought stated in one sentence in the last paragraph of its argument. Further, Grocers's proposed remedy is to "strike the property damages awarded" because the trial court "inflicted" prejudice on Grocers by creating "its own procedures to address [the Cabellos'] violation of the Texas Rules of Civil Procedure." Importantly, Grocers never presented any complaint to the trial court about the loss of a right to a jury trial.

–32–

When the trial court first gave Grocers the options of taking Weinstein's deposition and obtaining a rebuttal witness or holding a separate trial on the property damages issue, Grocers chose a separate trial, "subject to the objection that we don't believe it's proper at all." Later, when Grocers moved for a directed verdict as to property damages, its basis was "for all the reasons we said earlier." Grocers's counsel also stated: "Although I don't know that I have the authority to waive a jury trial on it, I suspect at the end of the day, we could probably agree to something." Finally, after the jury returned its verdict, the parties agreed on a value for the Cabellos' trucks. Grocers's counsel stated in its proposed rule 11 letter, later signed by counsel for the Cabellos, that she "still object[s] to the Court's allowing [the Cabellos] to recover these additional damages due to [their] failure to timely disclose these damages"; she also stated that by agreeing to specific amounts of damages for the trucks, she "specifically and expressly reserve[d] such right to dispute/appeal these additional amounts."

At no time did Grocers object that it was being deprived of its right to a jury trial on the issue of property damages. The quoted preface that counsel did not know that she had "the authority to waive a jury trial on it" was not an objection on which the trial court could have ruled, and the rest of the sentence was that "at the end of the day, we could probably agree to something." Specifically, counsel neither requested a ruling from the trial court nor did the trial court rule. An objection must not only identify the subject of the objection, but it also must state specific grounds for the ruling desired. TEX. R. APP. P. 33.1. Without a proper and timely presentation of the alleged error to the trial court, a party does not afford the trial court the opportunity to correct the error. *Birnbaum v. Law Offices of G. David Westfall, P.C.*, 120 S.W.3d 470, 476 (Tex. App.—Dallas 2003, pet. denied).

Counsel for Grocers at the most alluded to the question of her right to waive Grocers's right to submit the property damages to the jury. She did not object to the loss of Grocers's right to a jury.

And even that allusion was made after the Cabellos had rested their case. Rather than put the trial court on notice that Grocers intended to stand on the perfected right to a jury trial, the comment suggested that Grocers would be able to come to an agreement regarding the issue of property damages. Even assuming Grocers sufficiently presented an issue on appeal as to its right to a jury trial, it failed to preserve that issue. For all of the above reasons, we overrule Grocers's third issue.

## ISSUE FOUR: LITIGATION COSTS UNDER RULE 167

Grocers states in its fourth and final issue that "[t]his matter should be remanded to the trial court for the award of 'litigation costs.'" In its argument, it states for the first time on appeal that the final judgment contained an award of damages to Jose that should have triggered the award of litigation costs under rule 167 of the rules of civil procedure. It also argues the final judgment contained damage awards that should not have been submitted to the jury and when these damages are removed from the trial court's judgment, the amounts awarded to Ramiro fall to a level triggering Grocers's rule 167 settlement offer. Based on our resolution of Grocers's first three issues, we need not address Grocers's argument regarding Ramiro. We therefore review issue four only as to Grocers's arguments regarding Jose. Grocers also asks us to review that offer in the context of an "amended" offer to settle.[1]

### Applicable Law

Chapter 42 of the civil practice and remedies code and rule 167 of the rules of civil procedure provide that if a settlement offer made in accordance with the rule and statute is rejected and the judgment awarded at trial is significantly less favorable than the offer, then the court must award

---

[1] Grocers did not provide this Court with the original settlement offer that was presumably amended by the offer Grocers asks us to consider. The Cabellos contend that the first offer—the offer not included in the record—was larger than the amended offer and, as a result, Grocers is not entitled to litigation costs under rule 167.2(f). *See* TEX. R. CIV. P. 167.2(f) ("A rejection of an offer is subject to imposition of litigation costs under this rule only if the offer is more favorable to the offeree than any prior offer."). The Cabellos attached a March 24, 2009 settlement offer from Grocers to their brief, but documents attached as appendices to briefs do not constitute part of the record. *See Green v. Kaposta*, 152 S.W.3d 839, 841 (Tex. App.—Dallas 2005, no pet.). We thus do not consider the substance of that document in our review.

–34–

litigation costs to the party that made the offer. *See* TEX. R. CIV. P. 167.4(a); TEX. CIV. PRAC. & REM. CODE ANN. §§ 42.001–.005 (West Supp. 2012). As relevant here, a judgment award is significantly less favorable than a settlement offer if the judgment is less than 80% of the offer. *See* TEX. R. CIV. P. 167.4(b).

## Analysis

As a preliminary matter, we observe that Grocers states its issue as requesting a remand to the trial court for an award of litigation costs without stating how or if the trial court erred. It argues under that issue that "[t]he judgment now reflects an award that [is] less than 80% of the settlement offer made to [Jose]." In its appellate brief, Grocers argues "[t]he trial court did not award litigation costs for the claim, despite the matter being brought to its attention by [Grocers's] Motion to Disregard Jury Answers." In that motion, Grocers asked the trial court to limit the Cabellos' damages pursuant to chapter 42 of the civil practice and remedies code, claiming that "because the judgment to be rendered will be 'significantly less favorable' to [the Cabellos] than [Grocers's] May 8, 2009 Rule 167 Offer of Settlement, [chapter] 42 allows [Grocers] to recover [its] 'litigation costs' as an offset against [the Cabellos'] recovery." Grocers also attached a proposed final judgment based on the total award for all parties. Grocers's argument in both the motion to disregard jury answers and the proposed judgment is premised on the award to "plaintiffs" as a whole, not to Jose Cabello individually.

As noted above, rule 33.1 of the Texas Rules of Appellate Procedure requires as a condition to review that a party make an objection specific enough to call the trial court's attention to the specific error alleged. *See* TEX. R. APP. P. 33.1(a); *Hall v. Hubco, Inc.*, 292 S.W.3d 22, 33 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). Grocers contends that it brought this matter to the trial court's attention in its motion to disregard jury answers. Yet in that motion, Grocers requested

only that the trial court award litigation costs because the judgment to be rendered will be less favorable to all the Cabellos than the settlement offer. Assuming a request for litigation costs in a motion to disregard jury answers is enough to preserve error when a trial court fails to award litigation costs as required by rule 167, an appeal based on a calculation method never presented to the trial court does not preserve error. *See Hall*, 292 S.W.3d at 33 (in a request for attorney's fees, motion for entry of judgment not specific enough to preserve error "where the movant is claiming error on appeal based on a specific calculation error never pointed out to the trial court"). Grocers did not seek litigation costs as to any of the Cabellos individually—including Jose. We therefore question whether Grocers has preserved its request that this Court parse the settlement offer.

Assuming Grocers preserved its claim, we cannot conclude the trial court erred. The Cabellos do not argue that the settlement offer was not made in accordance with rule 167. *See* TEX. R. CIV. P. 167.1 (requiring certain litigation costs awarded against a party who rejects an offer if that offer was "made substantially in accordance with this rule"). Instead, the argument here regards interpretation of the settlement offer.

For the first time on appeal, Grocers argues that the settlement offer was not a single settlement offer, but a set of offers made to each Cabello individually. It argues that because there were individual offers, we must determine that the award to Jose—as opposed to the total award—was "significantly less favorable" than the settlement offer provided to him. The Cabellos argue that the settlement offer was an "aggregated offer of settlement" and must be compared to the combined final award to all the Cabellos.

Grocers relies on the statute and rule to argue that the settlement offer was made to each Cabello individually. It argues that rule 167 and chapter 42 "are predicated on offers made to individual parties, not aggregated parties." It points specifically to rule 167.1, which states that

"litigation costs may be awarded against *a party* who rejects an offer" (emphasis in Grocers's brief); section 42.004, which defines a significantly less favorable judgment as one that is 80% less than a rejected offer "if the rejecting party *is a claimant*" (emphasis in Grocers's brief); and section 42.001(2), which defines "claimant" as "a person making a claim." *See* TEX. R. CIV. P. 167; TEX. CIV. PRAC. & REM. CODE ANN. §§ 42.001, 42.004.

We reject Grocers's reasoning in this case. As the Cabellos correctly note, the applicable rules and statutes are interpreted so that the singular includes the plural and the plural includes the singular. *See* TEX. R. CIV. P. 3; TEX. CIV. PRAC. & REM. CODE ANN. § 1.002 (West 2002); TEX. GOV'T CODE ANN. § 311.012 (West 2005). Grocers also ignores statements in rule 167 and chapter 42 that specifically identify offers made to multiple parties. *See, e.g.*, TEX. R. CIV. P. 167.2(b) ("A settlement offer must . . . identify the party or parties making the offer and the party or parties to whom the offer is made; . . . [and] be served on all parties to whom the offer is made."); *see also* TEX. CIV. PRAC. & REM. CODE ANN. §§ 42.003, 42.005. That rule 167 refers to a singular party in some instances does not mean that multiple parties were not considered by the rules and—more importantly—has no bearing on Grocers's intent when it made the settlement offer.

We conclude based on a plain reading of the May 9 amended settlement offer that it was a single "aggregate settlement offer" made to all the Cabellos.[2] While the singular may include the plural and the plural may include the singular for purposes of interpreting rules and statutes, the same rule of interpretation does not necessarily apply in interpreting whether a settlement offer is a single offer made to multiple parties or a series of offers made to each party individually. Here, the settlement offer consistently describes itself as an "offer of settlement" made to the Cabellos

---

[2] In interpreting the settlement offer, we do not determine whether, as a matter of law, a joint "lump sum" offer will qualify as an offer under rule 167. *See* Elaine A. Carlson, *The New Texas Offer of Settlement Practice—the Newest Steps in the Tort Reform Dance*, 44 THE ADVOC. (TEXAS) 104, 107–08 (2008) (noting that "[i]t is not clear whether a joint 'lump sum' offer will qualify as an offer under Rule 167.").

generally, not "offers of settlement" made to each Cabello individually. For example, the May 9 offer states that Grocers "make[s] this written offer of settlement" to the Cabellos, stating further that Grocers's "offer of settlement also includes all attorney's fees, interests, and costs incurred by [the Cabellos] in bringing this lawsuit." It specifies that "[t]he deadline in which [the Cabellos] may accept this offer is 5:00 p.m. on May 25, 2009." But "[Grocers] retain[s] the right to withdraw this offer at any time before it is accepted . . . ." While the letter does allocate the total $130,000 award among the Cabellos, it says nothing regarding whether or how it could be accepted by only one of them. The offer consistently describes itself in the singular, and we interpret it pursuant to its plain language as a single offer to multiple parties.

As an offer made to all the Cabellos, the total settlement offer amount must be compared to the total monetary award in the final judgment. The total amount recovered by the Cabellos in the final judgment was $115,433.43, which is not less than 80% of the $130,000 offered to them in the settlement offer. The final judgment of the trial court was therefore not "significantly less favorable" than the settlement offer, and we overrule Grocers's fourth issue.

## CROSS-POINTS

### REFORMATION OF THE TRIAL COURT'S FINAL JUDGMENT

The Cabellos request in their first cross-point that we reform the final judgment to reflect the correct value for Angel's truck. The final judgment provided $4,521.00 in property damage for the value of Angel's 1996 Ford Ranger, but both the rule 11 agreement and Grocers's proposed final judgment provided $4,821.00 for the truck. The Cabellos contend the value of the truck was inadvertently reduced by $300.00 in the final judgment, most likely due to a typographical error on the part of the trial court.

–38–

A party who seeks to alter the trial court's judgment must file a notice of appeal. *See* TEX. R. APP. P. 25.1(c). The appellate court may not grant a party who does not file a notice of appeal more favorable relief than did the trial court except for just cause. *Id.* The Cabellos did not file a notice of appeal and have not shown "just cause." *See Richardson Indep. Sch. Dist. v. GE Capital Corp.*, 58 S.W.3d 290, 292 (Tex. App.—Dallas 2001, no pet.) (finding party waived issue when it did not file a notice of appeal or show just cause excusing failure to file appeal). We therefore decline to reform the award of property damages and overrule the Cabellos' first cross-point.

## REQUEST FOR SANCTIONS

The Cabellos argue in their second cross-point that sanctions against Grocers are appropriate. This court may, on the motion of any party or on its own initiative, award a prevailing party "just damages" if we determine that the appeal is frivolous. TEX. R. APP. P. 45. An appeal is frivolous when the record, viewed from the perspective of the advocate, does not provide reasonable grounds for the advocate to believe the case should be reversed. *Smith v. Brown*, 51 S.W.3d 376, 381 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). The decision to grant appellate damages as sanctions is a matter of discretion that must be exercised with prudence and caution and only after careful deliberation. *Id.* We also will impose sanctions only in circumstances that are truly egregious. *Id.*

The Cabellos' entire request for sanctions is comprised of the following two sentences:

Based on case misrepresentations, clear waivers, concealment of the prior offer, and violation of a clear warning earlier issued by this Court of Appeals to the Appellants' counsel, this Court of Appeals should issue sanctions against the Appellants. The appellees are entitled to the litigation costs as sanctions for defending this frivolous appeal.

After careful consideration of the record, briefs, and papers filed in this Court, we decline to award sanctions against Grocers in this case. We overrule the Cabellos' second cross-point.

-39-

## CONCLUSION

Grocers has failed to meet its burden of showing that Congress, by enacting IRCA, expressed a clear and manifest intent to supplant and override the sovereignty of Texas law allowing recovery for injuries caused by tortious conduct in the context presented. Further, based on the record of this case, the trial court did not abuse its discretion by excluding evidence of the Cabellos' legal status in the United States. We also conclude Grocers has not preserved its factual or legal sufficiency challenge to medical damages and in fact advised the trial court it was not challenging such evidence. Regarding its third complaint that the trial court enforced "two prejudicial options" of either trying property damages to the trial court after the jury's verdict or deposing an "undisclosed" witness during trial, we conclude the complaint has merit to the extent the trial court deprived Grocers of the constitutional right to have the jury decide all fact disputes. Yet Grocers waived that complaint by failing to object on that basis. To the extent Grocers complains about an "undisclosed" witness who had been identified only as a person having knowledge of the Cabellos' property damages, we conclude the trial court did not abuse its discretion by finding lack of unfair surprise. Finally, to the extent Grocers has raised an issue regarding entitlement to litigation costs based on its amended settlement offer to the Cabellos, it never asked the trial court to apportion the offer among the Cabellos and the total amount awarded to them in the final judgment did not meet the test for being "significantly less favorable" than the settlement offer. Regarding the Cabellos' cross-points, we decline to alter the judgment pursuant to the Cabellos' request to increase their property damage award because they did not file a notice of appeal and they have not shown "just cause." We also decline their request for sanctions against Grocers for a frivolous appeal. Having overruled all of the parties' issues, we affirm the trial court's judgment.

MARY MURPHY
JUSTICE

100843F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

GROCERS SUPPLY, INC. AND JOSE
NARCISO SANCHEZ, Appellants

No. 05-11-00843-CV     V.

JOSE LUIS CABELLO, ANGEL
CABELLO, AND RAMIRO CABELLO,
Appellees

Appeal from the 68th Judicial District Court
of Dallas County, Texas. (Tr.Ct.No. 08-
11463-C).
Opinion delivered by Justice Murphy,
Justices FitzGerald and Fillmore
participating.

     In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**. It is **ORDERED** that appellees Jose Luis Cabello, Angel Cabello, and Ramiro Cabello recover their costs of this appeal from appellants Grocers Supply, Inc. and Jose Narciso Sanchez.


Judgment entered December 21, 2012.


_____
MARY MURPHY
JUSTICE